UNIVERSAL C.I.T. CREDIT CORPORATION *v.* JOHN SHEPLER.

[No. 1-574A82. Filed June 18, 1975. Rehearing denied August 21, 1975. Transfer denied March 10, 1976.]

*James E. Hawes, Jr., G. Daniel Kelley, Jr., Ice Miller Donadio & Ryan,* of Indianapolis, *George A. Brattain, Marshall, Batman, Day & Swango,* of Terre Haute, for appellant.

*Raymond H. Modesitt, Dix, Patrick, Ratcliffe & Adamson,* of Terre Haute, for appellee.

LOWDERMILK, J.—This action was brought by plaintiff-appellee (Shepler) on the basis of an alleged tortious conversion committed by defendant-appellant (C.I.T.). From the verdict and judgment in favor of Shepler awarding compensatory and punitive damages, C.I.T. brings this appeal.

The facts most favorable to Shepler disclose that Shepler purchased a 1970 White Freightliner diesel tractor-truck from McCormick, Inc. of Vincennes, Indiana, on July 21, 1970. The truck had a purchase price of $26,000.00 and Shepler executed a retail installment contract and security agreement thereon after a down payment of $5,026.31. This contract was sold with recourse to C.I.T.

On May 22, 1971, Shepler leased the truck to Richard Earl Clough (Clough). The reason for this lease was the inability of Shepler to secure insurance on the truck and Clough immediately insured the truck in his own name on that date. Shepler had a history of tendering late payments to C.I.T. on the loan but all such late payments were accepted by C.I.T. when tendered.

Shepler endorsed a cashier's check and wrote a personal check, both of which were received by C.I.T. on May 28, 1971, to pay the May payment and the June payment.

On May 28, David Andrews, the local agent in Terre Haute, Indiana, for C.I.T., issued a repossession of the truck which was in Hastings, Florida where it was being loaded for a trip back to Indiana.

On June 1, 1971, Shepler contacted C.I.T. through its manager, Andrews, and demanded that the truck be returned to him. At that time Andrews informed Shepler that the truck had been picked up because of no insurance and because Shepler was behind on his payments.

Shepler has never regained possession of the truck.

Inasmuch as this court has determined that this cause must be reversed and remanded for a new trial we shall first write on what we have determined to be the reversible error.

C.I.T. timely tendered its Instruction No. 3, which reads as follows, to-wit:

"Under the contract between plaintiff and defendant, plaintiff agreed to deliver the tractor-truck collateral to defendant and agreed that defendant without notice or legal action, could peaceably enter any premises where the tractor-truck collateral may be found and take possession of it, if plaintiff in any way defaulted in performing any of his obligations under the contract *or if defendant in good faith considered plaintiff's debt under the contract or the tractor-truck collateral to be insecure.* Therefore, if you find from the evidence that plaintiff was in default of the contract, *or that defendant in good faith considered the debt of the plaintiff to be insecure, or that defendant in good faith considered the tractor-truck collateral to be insecure,* then you shall find that defendant lawfully took possession of the tractor-truck." (Our emphasis.)

and requested the same be read to the jury. This instruction was by the court refused.

The instruction sets out and gives to the jury the theory of C.I.T.'s case. C.I.T. proceeded, at least in part, on this theory and introduced evidence to sustain that theory and the same was within the issues.

In the case of *Lavengood* v. *Lavengood* (1947), 225 Ind. 206, 73 N.E.2d 685, 687, our Supreme Court, in speaking on this subject said:

"A party who makes a proper request is entitled to have an instruction based upon his own theory of the case if within the issues and there is any evidence fairly tending to support it. . . ."

See also: *Gamble* v. *Lewis* (1949), 227 Ind. 455, 465, 85 N.E.2d 629, 634; *Barnes* v. *Deville* (1973), 155 Ind. App. 387, 293 N.E.2d 54; *Jackman* v. *Montgomery* (1974), 162 Ind. App. 558, 320 N.E.2d 770.

This court is constrained to hold that the trial court should have given C.I.T.'s tendered Instruction No. 3, and said Instruction No. 3 not being covered by any other instruction given by the court, reversible error was committed.

Although this is a case of tortious conversion the parties cannot, simply by bringing a suit in tort, ignore the fact that the contract here involved was one subject to the Uniform Commercial Code. The common law and the Code provisions supplement one another and should be construed together. See IC 1971, 26-1-1-203 (Burns Code Ed.). We note that Section 1-208 of the Uniform Commercial Code is particularly applicable here since the contract contained a clause which allowed C.I.T., as the secured party, to peaceably repossess the truck if it, in good faith, felt insecure as to the debt or collateral. Further, Section 9-503 of said Code specifically permits a secured party to repossess collateral upon default.

Under the Uniform Commercial Code, the burden was on Shepler to show a lack of good faith on the part of C.I.T. This question is one which must be decided in addition to whether or not Shepler was in default under the security agreement. Thus, although there may be a finding that Shepler was not in default as to his payments, that decision is not completely determinative of all the issues here involved. See IC 1971, 26-1-1-208 (Burns Code Ed.).

Inasmuch as the matter of the good faith of C.I.T. will necessarily be an issue in the retrial of this cause we will write on that issue in order to establish guidelines for the court.

The agreement entered into between the parties reveals the following:

"Time is of the essence . . . The full balance . . . shall become due and payable forthwith, without notice or demand . . . (2) at holder's option, if the Customer defaults in performing an obligation under this contract, or, *if holder shall in good faith consider the indebtedness or the commodity insecure . . .*" (Our emphasis.)

This, in substance, means that if the creditor feels insecure he may not only accelerate payment but may repossess the truck without demand or notice, solely upon C.I.T.'s determination, a subjective test of the creditor's belief.

We have determined that in Indiana our courts of appeal have not spoken to the test we should use and in effect the standard of good faith to be used has not been determined. If the good faith provision of IC 1971, 26-1-1-208, *supra,* in conjunction with the good faith definition of IC 1971, 26-1-1-201(19), Ind. Ann. Stat. § 19-1-201(19) (Burns 1964 Repl.), is to have any real effect, the subjective test will have to be modified. See, J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code, p. 959, § 26-3 (1972).

In the case at bar the trial court used the standard of the good faith definition of "honesty in fact" IC 1971, 26-1-1-201(19), *supra,* which fitted into Shepler's tortious conversion theory that C.I.T. did not have the right to possession, resulting in the jury's determination that there was no default and C.I.T. was not justified in believing there had been.

Shepler contends C.I.T. did not act in good faith in coming to that fixation of the mind that their security was in jeopardy in that they could have made a further, more honest and more complete investigation as to the probability of loss through insecurity.

Mr. Shepler was never asked to assist C.I.T.'s agent in C.I.T.'s determination as to whether or not the security was in jeopardy.

In our opinion a question of fact has been raised as to whether C.I.T., through its agent, acted in good faith in

determining with any of the mental processes whether the indebtedness was or was not secure.

The cases of *Sheppherd Federal Credit Union* v. *Palmer* (1969), 408 F.2d 1369, 1373; *Fort Knox National Bank* v. *Gustafson* (Ky. App. 1964), 385 S.W.2d 196, 200; and *Flynn* v. *Hendrickson* (1911), Nebraska, 131 N.W. 934, have held that to be in good faith the creditor must make a diligent and honest effort to discover from all available sources that the security is greatly impaired. This standard will, however, still permit the creditor to prevail if a subjective determination of good faith is shown and it is our opinion that the creditor should be held to a more objective standard. Therefore, the good faith should be further subject to the test that the determination thereof would have been one made by a "reasonable man" under the same set of facts or circumstances.

Another problem which will confront the parties and the court on retrial in the event the jury finds for Shepler is the issue of damages.

The general rule as to damages in a conversion action is that the damages are measured by the value of the converted property at the time of the conversion, with interest from the date of conversion. *Miller, et al.* v. *Long* (1955), 126 Ind. App. 482, 131 N.E.2d 348; *Sikora* v. *Barney, et al.* (1965), 138 Ind. App. 686, 207 N.E.2d 846. This rule, however, may vary in some circumstances depending upon the particular facts of the case and the type of property involved. It is our opinion that the above stated general rule should be considered in light of the principle that the party whose goods were converted should be compensated for all actual losses or injuries sustained as a proximate result of the conversion. *Johnson* v. *Culver* (1888), 116 Ind. 278, 19 N.E. 129; *Jeffersonville Silgas, Inc.* v. *Wilson* (1972), 154 Ind. App. 398, 290 N.E.2d 113.

Therefore, in addition to the usual damages which may be awarded in a conversion action further special damages *may*

be awarded if they are adequately proven by the plaintiff. *Miller* v. *Long, supra; Jerry Alderman Ford Sales, Inc.* v. *Bailey* (1972), 154 Ind. App. 632, 291 N.E.2d 92.

We wish to emphasize that the award of any damages beyond those traditionally allowed should not be speculative and should compensate the wronged party only for actual damages or loss.

Judgment reversed and remanded to the trial court for a new trial.

Robertson, C.J., concurs; Garrard, J., concurs with opinion.

### CONCURRING OPINION

GARRARD, J.—I agree that the judgment in this case must be reversed, but for different reasons than that assigned by the majority.

In July 1970, Shepler purchased a truck tractor by making a down payment and executing an installment sale contract and a security agreement on the tractor. These were sold to C.I.T. with recourse.

In May 1971, C.I.T. repossessed the tractor while it was in Florida to pick up a load of potatoes.

Shepler demanded return of the tractor, and when C.I.T. refused, he brought suit. The complaint alleged conversion but, also, contained claims for exemplary damages and actual damages for loss of use. The jury returned a verdict for Shepler.

The security agreement held by C.I.T. provided for acceleration:

"... at holder's option, if the customer defaults in performing any obligation under this contract or, if holder shall in good faith consider the indebtedness or the commodity insecure."

and, that in such event:

"Customer shall pay said amount or, at holder's option, shall deliver the commodity to holder, and holder may, without notice or legal action ... take possession. ..."

Thus, when Shepler brought his action, C.I.T. defended upon the basis that it had been entitled to take possession under the provisions of the security agreement.

Shepler had been late in making monthly payments. Shortly before the repossession was ordered on May 28, Shepler made the payments for May and June by delivering a cashier's check for a portion of the payments together with his personal check for the balance. While it appeared that C.I.T.'s manager thought the personal check was no good, the bank president testified at the trial that if the check had been presented for payment in due course it would have been honored.

As a second specific default, C.I.T. referred to the provision in the security agreement which required that the tractor be insured. The C.I.T. agent understood that the policy of insurance covering the tractor applied only within a trip radius of 300 miles, and when he discovered the truck had gone to Florida, he thought the insurance agreement had been breached. The policy, however, permitted individual trip coverages to be purchased separately for trips beyond the 300 mile limitation, and there was evidence that Shepler delivered the application for such coverage to the insurance agent before the truck left on the trip.

There was, thus, evidence from which the jury might have found that neither of the specific defaults asserted by C.I.T. existed.

C.I.T.'s principal contention on appeal is that it was precluded at the trial from establishing the remaining portion of the defense provided by its security agreement: That it was entitled to repossess the tractor, despite the lack of any actual default, if in good faith it considered that either the debt or the security, itself, were insecure.

Shepler responds that while the "insecurity clause" may create a right to repossess, in the present case no error has properly been preserved.

We must therefore turn to the specific errors argued by C.I.T.

The evidentiary errors asserted by C.I.T. relate to its attempts to present to the jury evidence of Shepler's conduct, not in the performance of his specific contractual obligations with C.I.T., but conduct which might form a basis for C.I.T. to determine that either the debt or the tractor were insecure. (The primary thrust of this evidence appears to be that on prior occasions Shepler's creditors had been left with trucks in a state of disrepair as their only security for a defaulted debt.)

The insecurity clause gave to C.I.T. an option to repossess if it deemed either the debt or the collateral insecure.

Such insecurity clauses are authorized by the Uniform Commercial Code, IC 1971, 26-1-1-208 (Burns Code Ed.).[1] Their precise meaning in Indiana has not been established, and debate continues among the several jurisdictions as to whether such provisions are purely subjective, requiring merely a "pure heart and empty head", or whether some objective standard of reasonableness is inherent in the requirement of good faith.[2]

It is clear that the drafters of the UCC intended to promote commercial dealing and credit financing by permitting creditors to realize upon their security in doubtful situations without the necessity of a specific default.

It is, however, equally clear that a purely subjective test is subject to arbitrary abuse. It would allow a creditor to be unreasonable and place the debtor in an unjust position since the creditor might at any time call the entire debt and require the debtor to prove the non-existent state of

---

1. "26-1-1-208 [19-1-208]. Option to accelerate at will.—A term providing that one [1] party or his successor in interest may accelerate payment or performance or require collateral or additional collateral 'at will' or 'when he deems himself insecure' or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised. [Acts 1963, ch. 317, § 1-208, p. 539.]"

2. See, e.g., Article, 11 Boston College Law Review 531; 2 Gilmore, Security Interests in Personal Property § 43.4.

mind of the creditor.[3] Thus, under this interpretation, the code would permit a creditor to destroy a viable contractual relationship without requiring him to justify his actions.[4]

Accordingly, the better decisions have injected some objectivity into the standard.

Perhaps the minimum is that expressed by the court in *Fort Knox Nat'l Bank* v. *Gustafson* (1964 Ky. App.), 385 S.W.2d 196. There the court stated:

> "We construe the latter provision [definition of 'burden of establishing' in Section 1-201(8)] as requiring the submission to the jury of the issue of good faith unless the evidence relating to it is no more than a scintilla, or lacks probative value having fitness to induce conviction in the minds of reasonable men." 385 S.W.2d 200.

In other words, some evidence of probative value to support the subjective determination is necessary.

Professor Gilmore, quoted with approval by the court in *Sheppard Fed'l Credit Union* v. *Palmer* (5th Cir. 1969), 408 F.2d 1369, 1371, n. 2, interprets § 208 to mean in substance that:

> ". . . [T]he creditor has the right to accelerate if, under the circumstances, a reasonable man, motivated by good faith, would have done so."

I accept this as the better statement of the law.[5]

Thus, once the security agreement was admitted or proved in evidence, Shepler had the burden of establishing lack of good faith. This he might do by establishing:

1. That the reason for the creditor's action was not because of a feeling that the debt or security was insecure, i.e., the insecurity clause does not constitute a bootstrap defense where a creditor has repossessed relying on other grounds; or

---

3. The debtor must establish lack of good faith. IC 1971, 26-1-1-208 (Burns Code Ed.)

4. 11 Boston College Law Review 540.

5. From the cases discussing § 208 it appears the courts have had considerably more success in determining bad faith than in defining good faith. Professor Gilmore's standard leaves the determination to a consideration of reasonableness under *all* of the attendant circumstances. This is more in keeping with the overall concept of the code toward commercial reasonableness than a specific enumeration of factors that must be considered if the quotient is to be good faith.

2. That upon a consideration of all the circumstances known to the creditor, a reasonable man motivated by good faith would not have taken the action; or

3. That upon a consideration of all the circumstances, a reasonable man motivated by good faith would not have taken the action upon the circumstances known to the creditor without further preliminary action, such as inquiry directed to the debtor or other persons.

The first of the asserted evidentiary errors arose during the cross examination of Shepler while he was presenting his case in chief.

C.I.T. attempted to inquire about trucks he had purchased in the past. Shepler's objection to this inquiry was properly sustained since no foundation making the evidence relevant had been laid by any showing that C.I.T. had in its possession, at the time it ordered the tractor repossessed, any information about Shepler's prior dealings which tended to make C.I.T. feel insecure. To the contrary, there was introduced into evidence as plaintiff's exhibit 7 the repossession notice C.I.T. had subsequently sent to Shepler which stated the sole ground for repossession to be "by reason of default in the payment of your account."

For the same reason, the various objections were properly sustained to the same questions C.I.T. asked of various witnesses it called in its defense. There was no showing that the matters these witnesses were asked about were both known to C.I.T. at the time it decided to repossess the tractor *and* formed a part of the basis for its decision.

In other words, the truth or falsity of this collateral information was relevant to the proceedings only after there was evidence introduced that C.I.T.'s decision to repossess was based upon a decision that it was insecure, which in turn was based, at least in part, upon its awareness and belief of the collateral information.

With regard to C.I.T.'s examination of its own agent, no error has been preserved for appeal upon the objections

to his testimony which were sustained because no offer of proof was made. *State* v. *Lonergan* (1969), 252 Ind. 376, 248 N.E.2d 352; *Bechert* v. *Lehe* (1974), 161 Ind. App. 454, 316 N.E.2d 394; *State* v. *Quackenbush* (1973), 158 Ind. App. 603, 303 N.E.2d 830.

Moreover, the questions posed remained technically defective in that once again they sought to simply inquire whether the agent had been told something by somebody without ever establishing that such information formed any part of the basis for the decision to repossess. In addition, some were leading, or failed to specify that the point of inquiry was the time the decision to repossess was made rather than later.

C.I.T. objects to the refusal of the court to give its tendered instructions numbered 1 and 3.

Instruction 1 enumerated eight factors and was an attempt to advise the jury what they might consider in determining whether C.I.T., in good faith, deemed itself insecure. The instruction was erroneous. It failed to advise the jury that they should consider all of the circumstances. It specified factors not in evidence, such as what Shepler did with other tractors he had financed.

Instruction 3 relied upon by the majority for reversal, attempted to define the insecurity defense. However, it also instructed the jury that if plaintiff "in any way defaulted in performing any of his obligations under the contract . . . then you shall find that the defendant lawfully took possession of the tractor-truck." This, of course, was not a correct statement of the law since it mandated a finding for the defendant if the jury found plaintiff in any way defaulted, regardless of whether C.I.T. might have waived that default. See, *Snyder* v. *Int'l Harvester Credit Corp.* (1970), 147 Ind. App. 364, 261 N.E.2d 71; *Farm Bureau Mut. Ins. Co. of Ind.* v. *Emmons* (1952), 122 Ind. App. 440, 104 N.E.2d 413.

The same defect made defendant's tendered instruction 2 improper. It mandated the jury to find for C.I.T. if it found Shepler did not have the truck insured when it left the state,

regardless of whether C.I.T. was entitled to rely on that default.

Rule TR. 51 (B) provides:

"After argument the judge shall instruct the jury as to the law upon the issues presented by the evidence."

The rule describes when the final instructions are given and what they encompass. C.I.T. urges, however, that the rule imposes upon the court the affirmative duty to instruct the jury on all the issues, and that it was error for the court to fail to instruct the jury specifically upon the insecurity defense.

Prior to adoption of the new rules of civil procedure, it was said that such an affirmative duty existed as to general but not as to special instructions. However, no Indiana case ever really defined those terms. This appears to have occurred for two reasons. It appears to have been generally presumed that the court must have given proper general instructions. See, 2 Gavit: Indiana Pleading & Practice §§ 392, 393. Secondly, at a very early date, the Supreme Court decided that no error was available on appeal addressed to the court's failure to instruct (assuming the affirmative obligation existed) unless the appellant raised the issue by specific objection or exception before the instructions were delivered to the jury. *Krack* v. *Wolf* (1872), 39 Ind. 88.

The commission comments indicate that the prior law was intended to apply under TR. 51 (B). Thus, whatever the obligation of the court may be in a particular case, it seems clear that at least where the issue in question is not specifically called to the court's attention and some objection made on the record to the failure of the court to instruct the jury on that issue, no error is preserved for appeal.

Since C.I.T. made no such objection at the trial, it has waived any error that might have thus occurred. Having so ruled, I am nevertheless constrained to emphasize my opinion that it is the function and responsibility of the trial court in the first instance to insure that its jury is properly instructed

on the law applicable to the issues in the case. See, *Wolff* v. *Slusher* (1974), 161 Ind. App. 182, 314 N.E.2d 758.

C.I.T. next asserts error in the assessment of damages.

The first contention is that in an action for conversion, damages other than those representing the fair market value of the chattel at the time of conversion are not recoverable.

However, in *Jerry Alderman Ford Sales, Inc.* v. *Bailey* (1972), 154 Ind. App. 632, 291 N.E.2d 92, we affirmed the principle that the purpose in awarding damages is to fairly compensate an injured person in full for the wrong done him.

In the prior case of *Miller* v. *Long* (1956), 126 Ind. App. 482, 131 N.E.2d 348, this court had already determined that special damages might be pleaded and proved in a conversion action.

As Shepler's pleadings, as well as the evidence, presented the issue of special damage accruing from loss of use, there was no error in that regard.

It is urged that the court erred in allowing into evidence plaintiff's exhibit 9, a financial statement of C.I.T. Financial Corporation. By way of preliminary question it was adduced that the exhibit was the financial statement of the parent company "which would, of course, include all the subsidiary operations. C.I.T. Financial Services [the defendant] is simply a subsidiary of C.I.T. Financial Corporation."

The financial state of a defendant has some relevancy where punitive or exemplary damages are in issue, since the purpose of an award of such damage is to punish the defendant and set an example to deter others from similar conduct. *Physicians Mutual Ins. Co.* v. *Savage* (1973), 156 Ind. App. 283, 296 N.E.2d 165.

The only objection to the exhibit when it was offered was that it was not relevant to the issues and would have no bearing on the question of the transaction between the plaintiff and defendant. Furthermore, no request was made for a cautionary instruction or limitation on the use of the exhibit.

Under these circumstances I am unable to find reversible error. The exhibit was potentially relevant on the question of exemplary damages and the mere objection that it was irrelevant and beyond the issues is insufficient as a predicate for harmful error. *Vanosdol* v. *Henderson* (1939), 216 Ind. 240, 22 N.E.2d 812; *Altmeyer* v. *Norris* (1954), 124 Ind. App. 470, 119 N.E.2d 31.

Having disposed of these preliminary contentions, I would turn to the assertion that the damages, both compensatory and exemplary, were not sustained by the evidence, were contrary to law, and were excessive.

In considering compensatory damages, it is axiomatic that the verdict will not be set aside unless the award is so excessive as to induce the belief that the jury acted from partiality, prejudice, corruption or other improper motive. See, cases collected 2 West's Indiana Digest, *Appeal & Error*, § 1004(1). This has been interpreted to mean that the verdict cannot be explained upon any other reasonable hypothesis. *Ind'pls & C.T. Co.* v. *Roach* (1922), 192 Ind. 384, 135 N.E. 334; *Kawneer Mfg. Co.* v. *Kalter* (1918), 187 Ind. 99, 118 N.E. 561. In other words, where there is any substantial evidence of probative value from which the jury might have fairly arrived at the result, it is not our province to set the award aside. *Pohlman* v. *Perry* (1952), 122 Ind. App. 222, 103 N.E.2d 911.

On the other hand, as stated by the court in *Bangert* v. *Hubbard* (1955), 127 Ind. App. 579, 587, 126 N.E.2d 778, 782:

"However, when a verdict is so grossly disproportionate to any reasonable compensation warranted by the facts that it shocks the sense of justice and raises at once a strong presumption that it is based on prejudice or passion rather than on sober judgment, a court of appeals should not hesitate to set it aside notwithstanding that the trial court had refused to do so."

Punitive or exemplary damages are subject to the same review. *Bangert, supra.* While they are less susceptible to precise equation with the evidence than many aspects of

compensatory damage, the jury considering such an award is no less subject to the admonition that the amount is to be determined by the jury's calm and deliberate consideration of the purposes for which they are awarded. The law prohibits a jury from determining liability or compensatory damages based upon passion or prejudice regarding one of the parties. It imposes the same prohibition upon determining the liability for or amount of exemplary damages. *Murphy Auto Sales, Inc.* v. *Coomer* (1953), 123 Ind. App. 709, 112 N.E.2d 589.

Admittedly, in the present case, the damage evidence was not overly precise. No one offered direct opinion evidence of the value of the tractor at the time of conversion or of the amount of time reasonably necessary for its replacement.

The evidence did disclose that Shepler had purchased the tractor for $26,000 and had operated it for approximately 10 months. At the time of repossession it had been driven about 85,000 miles. Shepler testified that the tractor might be expected to last about a million miles with two or three major overhauls. After repossession, C.I.T. sold the tractor for $19,000. It was undisputed that the balance owed C.I.T. at the time of repossession was $18,698. Shepler also testified that shortly before the repossession he had spent between $1,200 and $1,500 for new tires.

At the time of repossession Shepler had just entered into a lease of the tractor. The lease term was six months. However, there was no minimum or guaranteed rental payment and the lease was cancellable by either party on five days' notice. The evidence favoring Shepler establishes that the called-for lease payments of 35 cents per loaded mile constituted fair rental value. In addition, the evidence favoring Shepler would anticipate that the tractor would operate approximately 8,000 loaded miles per month.

We would be justified in assuming that upon the evidence, the jury found that Shepler should receive compensatory damages for loss of use. Such damages are ordinarily measured by the fair rental value of the chattel, although in an

appropriate case it is not error to consider lost net profits where they are not speculative. *Jerry Alderman Ford, supra; Wolff, supra.* Where, however, the chattel is destroyed, becomes worthless, or cannot be returned, damages for loss of use are limited to the time reasonably necessary for replacement. *Jerry Alderman Ford, supra; N.Y.C.R.R. Co.* v. *Churchill* (1966), 140 Ind. App. 426, 218 N.E.2d 372.

The maximum value of the tractor supported by the evidence, after deduction of the balance owed, was potentially $5,000 to $6,500. The evidence sustained loss of use at a value of $2,800 per month.

It is readily apparent that the damage product falls grossly short of the $33,000 sum found by the jury as actual damages. So much so that the jury must have either been motivated by passion or prejudice, or based its verdict on improper items of damage. See, *Indiana Pipeline Co.* v. *Christensen* (1919), 188 Ind. 400, 123 N.E. 789.

Furthermore, on the record before us it appears the award of $92,000 exemplary damages was improperly motivated.

Nor can we say that proper damages are so discernable, or the excesses so small proportionately that they do not evidence effect upon the substantial rights of the parties so as to permit us to simply order remittitur. *Estate of Gaugh* v. *Gore* (1954), 125 Ind. App. 282, 123 N.E.2d 199.

Accordingly, I agree that the judgment must be reversed and a new trial ordered.

NOTE.—Reported at 329 N.E.2d 620.