WATSEKA FIRST NATIONAL BANK, Plaintiff-Appellee, v. FRANK RUDA *et al.*, Defendants-Appellants (Ken L. Ward *et al.*, Defendants).

Third District   No. 3—87—0796

Opinion filed September 8, 1988.—Modified on denial of rehearing November 29, 1988.

Ronald E. Boyer, of Watseka, for appellants.

Robert W. Boyd, of Ackman, Marek, Boyd & Simutis, of Kankakee (Frank J. Simutis, of counsel), for appellee.

JUSTICE BARRY delivered the opinion of the court:

Frank and Virginia Ruda, guarantors on two promissory notes signed by Ken Ward, their son-in-law, appeal from a judgment in the amount of $186,322.97 entered against them in favor of Watseka First National Bank (Bank).

The Rudas owned some 1,000 acres of farmland in Iroquois County. Ken Ward farmed the land and paid cash rent to the Rudas. Ward financed his farming operation primarily with the Watseka Bank. In May of 1983, Ward signed two promissory notes: (1) $125,000 as a renewal of earlier loan to purchase capital assets and (2) $121,000 for operating expenses. One of the terms of the notes was: "If the holder deems itself insecure then at its option, without demand or notice of any kind, it may declare this note to be immediately due." The due date for both notes was March 27, 1984. Although Ward's cash flow position was questionable, the Watseka Bank agreed to loan the money upon Rudas' guaranty of the debt. The Rudas' financial statement at that time showed that they owned land with a value in excess of $3 million and had a net worth of $2,143,000.

On October 21, 1983, the officers and attorneys for the Watseka Bank and Iroquois First State Bank met with Ward and Frank Ruda to discuss their financial situation. Officers of the Watseka Bank testified at trial that they discovered in the fall of 1983 that the Iroquois Bank had a lien on the crop growing on the Ruda farm and also that Ward had a partner in his farming operation who was entitled to one-fourth of the crop. The loan officer who dealt with Ward admitted that the Iroquois Bank lien had been filed in December of 1982, six months *before* the Watseka Bank loaned Ward $246,000 with the crop as collateral and that the Watseka Bank had a document so showing. At the October 1983 meeting the Watseka Bank determined that the due dates of the notes should be accelerated, and Ruda was advised that he must sell some or all of his farm in order to satisfy his debts and avoid a foreclosure action.

At trial the Watseka Bank officers testified that the decision to accelerate was made because Ward's cash flow was insufficient to retire the debt when due and that this insufficiency was caused by the Iroquois Bank's prior lien, by Ward having obligated one-fourth the crop to a partner, and by the drought, resulting in a poor crop. Bank officers also stated that Ruda's net worth had deteriorated between May and October 1983, due to falling land values.

According to the testimony of Ward, the Watseka Bank knew that he had a partner before the May 2, 1983, loan was formalized. The Bank's own records recite knowledge of the partnership as of Febru-

ary of 1983. After the October 1983 meeting, Ward began selling his equipment, cattle, and grain at private sales and turning over the proceeds of the sales to the Watseka Bank to apply on his debts. Ward also sought additional financing from the Farmers Home Administration but was turned down. The Bank prepared notices of termination of the farm lease for Ruda to send to Ward in order to make the farmland more salable.

The Watseka Bank bought this action to collect on the promissory notes. The Wards were dismissed after they filed bankruptcy. At the bench trial, the Rudas admitted that they had executed valid unlimited guarantees for the Ward notes, but they asserted as affirmative defenses, *inter alia*, that plaintiff Bank was required to give the guarantor notice of the disposition of the collateral and failed to do so and that the acceleration of the notes was not done in good faith. The trial court held that the Bank had no duty to give notice of the sale of the collateral to Ruda because Ward voluntarily sold the property which secured his notes. The trial court also held that "the bank had no basis for accelerating the maturity date on the notes and that the application of the proceeds from the sale of the collateral was incorrectly done by the plaintiff." The court then entered judgment for plaintiff on the notes. The court also ordered that the balance due on the notes be redetermined to the extent the wrongful acceleration affected the application of the proceeds of the sale of the collateral to interest rather than principal.

On appeal the parties do not dispute the corrected computation of the application of the proceeds of sale of the collateral. Defendants Ruda contend here that the court erred in refusing to rule as follows: (1) that the guarantors were entitled to notice of the sales of collateral under section 9—504 of the Uniform Commercial Code (Ill. Rev. Stat. 1985, ch. 26, par. 9—504); and (2) that the plaintiff Bank failed to act in good faith in violation of section 1—208 of the Uniform Commercial Code in accelerating the maturity date of loans and in interfering with Ward's attempt to obtain refinancing. After carefully examining the arguments and the evidence in the record, we conclude that the Bank did not act in good faith in accelerating the due date of the two notes; consequently, we do not reach the other issues.

Section 1—208 of the Uniform Commercial Code provides:

"A term providing that one party *** may accelerate payment or performance *** 'when he deems himself insecure' or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The bur-

den of establishing lack of good faith is on the party against whom the power has been exercised." Ill. Rev. Stat. 1985, ch. 26, par. 1—208.

■ This provision circumscribes the right of the creditor to accelerate payment upon whim or caprice; the option to accelerate can be exercised only in the good-faith belief that the prospect of payment of the debt is impaired. (15A Am. Jur. 2d, *Commercial Code* §35 (1976).) Illinois courts have not previously determined whether the test of good faith under this section is a subjective standard (that a creditor honestly believes he is insecure regardless of whether such belief is justified) or an objective standard (that a reasonable person would have accelerated under the circumstances). (*Bartlett Bank & Trust Co. v. McJunkins* (1986), 147 Ill. App. 3d 52, 497 N.E.2d 398.) We adopt the view that the creditor bank cannot declare itself insecure unless a reasonable person would have made the same determination under the same facts. (*Brown v. Avemco Investment Corp.* (9th Cir. 1979), 603 F.2d 1367; *Universal C.I.T. Credit Corp. v. Shepler* (1975), 164 Ind. App. 516, 329 N.E.2d 620.) The question here, then, is whether the Bank had a reasonable basis for accelerating the due date of the notes.

The trial court expressly found that the defendant Bank had no basis in fact for accelerating the due date of the two notes. The evidence adduced at trial supports that finding. Although witnesses for the Bank mentioned that the debtor's cash flow would be inadequate to meet his obligations in part due to the prior lien and the money due his partner, the evidence is clear that the Bank knew those facts prior to making the loans in May of 1983. These cannot be valid reasons for accelerating the due dates, particularly since the Bank's own documents indicate that the guaranty was required precisely because Ward's projected cash flow was weak. In other words, the Bank cannot advance as a good-faith reason for acceleration of due date the same facts which were the basis for requiring a guarantor of the loan some five months earlier.

Bank witnesses also testified that they felt insecure because the Rudas' net worth was deteriorating. However, there was no evidence of additional liabilities or loss of assets. The only change was a general decline in property values. The only evidence of the extent that the decline in land prices affected the Rudas' net worth is the testimony of Frank Ruda indicating that his net worth went from approximately $2 million in 1981 and 1982 to $1 million at the time he sold his farms in 1984 several months after the Bank declared the notes due. Even a net worth of $1 million was more than four times the amount of the loans which the Rudas had guaranteed and thus could not have rendered the

Bank insecure.

■■ ■ We conclude that the trial court's failure to find an absence of good faith in the acceleration of the due date of Ward's debt was contrary to the manifest weight of the evidence in this case. We further hold that the failure to deal with the Rudas in good faith releases them from liability as surety. We derive that conclusion from two Illinois cases. In *Grundy County National Bank v. Cavanaugh* (1982), 105 Ill. App. 3d 718, 721, 434 N.E.2d 803, 806, Justice A.L. Stouder, speaking for this court, stated the following rule: "We recognize that any agreement between a creditor and a principal in an obligation or debt which essentially varies the terms of the contract without the consent of the surety will release the surety from liability ***." Accord, *Watkins Products, Inc. v. Walter* (1973), 11 Ill. App. 3d 417, 296 N.E.2d 859.

Looking at the case at bar through the prism of the applicable case law, it is obvious that the terms of the principal obligation were materially changed without the consent of the Rudas when the Bank chose to accelerate the due date of the principal obligation. Because of the Bank's acceleration of the payments, the Wards became unexpectedly indebted to such an extent that their only recourse was bankruptcy. If the Bank had not accelerated the payments, the Wards might have been able to reduce the principal debt with income received between the time of the acceleration and the time the notes would have otherwise matured. Additionally, the Bank's acceleration and other conduct hampered the Wards' ability to obtain refinancing. Had they refinanced, the Wards might have been able to meet their obligations without financial assistance from their guarantors. Thus, the Bank's actions altered the principal obligation which the Rudas undertook in guaranteeing the Wards' notes. We hold that the Bank's acceleration, not having been exercised in good faith, released the Rudas from their guarantee.

In addition, it would appear that the Bank released the liens on the various items of collateral as they were sold by Ward without the prior consent of the Rudas. Frank Ruda testified that he knew what was sold only after it was sold. He had no opportunity to protect himself.

The judgment of the trial court is reversed, and judgment is entered for the defendants, Virginia and Frank Ruda.

Reversed.

STOUDER, P.J., and SCOTT, J., concur.