799 P.2d 581

**J.R. HALE CONTRACTING CO., INC., a New Mexico corporation, Plaintiff–Appellant,**

v.

**UNITED NEW MEXICO BANK AT ALBUQUERQUE, f/k/a American Bank of Commerce, Defendant–Appellee.**

No. 17889.

Supreme Court of New Mexico.

Oct. 4, 1990.

Mathews, Crider, Calvert & Bingham, P.C., Carl A. Calvert, David G. Reynolds, Albuquerque, for plaintiff-appellant.

Keleher & McLeod, P.A., Russell Moore, Phil M. Krehbiel, Kurt Wihl, Albuquerque, for defendant-appellee.

## OPINION

RANSOM, Justice.

This suit involves the claimed wrongful acceleration of a $400,000 promissory note given by J.R. Hale Contracting Company (the company) to the United New Mexico Bank at Albuquerque. At a trial on the merits the district court granted the bank's motion for a directed verdict, finding that the acceleration was justified because an interest payment was twenty-three days past due when the decision to accelerate was made. The company appeals and we reverse, holding that a factual question exists on whether the bank is estopped from using the default clause in the contract in order to justify acceleration without prior notice and an opportunity to cure.

In addition to its defense under the default provision in the contract regarding past due payments, the bank relied upon an insecurity clause and asserted that the company had failed to make a prima facie showing that the bank lacked good faith in accelerating payment under that clause. We agree with the trial court that sufficient facts were introduced on this issue to raise a jury question. Therefore, denial of the bank's motion for a directed verdict on this basis was proper. We remand the cause for a new trial to encompass both the estoppel and lack of good faith issues. The company must prevail on both issues in order to recover on its claim for damages.

The company had been a customer of the bank for about eleven years prior to the circumstances that gave rise to this suit. During this period of time the company entered into numerous revolving credit notes with the bank in gradually increasing amounts. These notes routinely were renewed on or about the due date despite the

fact that the company frequently was late a number of days or even weeks in making its payments. The bank seems not to have been troubled by the payments being past due and took no action in each instance other than possibly contacting the company to request that the payments be brought up to date. The company would send a check or the bank simply would deduct the payment from one of the company's accounts at the bank and send a notice of advice regarding the transaction.

The note at issue in this case was executed in November 1982 in the amount of $400,000. This was double the amount of any previous note. The first and only interest payment on the note was due March 1, 1983, and the note itself was due on July 31, 1983. The note provided that:

> If ANY installment of principal and/or interest on this note is not paid when due ... or if Bank in good faith deems itself insecure or believes that the prospect of receiving payment required by this note is impaired; thereupon, at the option of Bank, this note and any and all other indebtedness of Maker to Bank shall become and be due and payable forthwith without demand, notice of nonpayment, presentment, protest or notice of dishonor, all of which are hereby expressly waived by Maker * * * *

Toward the end of February 1983, J.R. and Bruce Hale, on behalf of the company, approached the bank to borrow additional funds to cover contracting expenses associated with construction at the Double Eagle II Airport in Albuquerque. The existing $400,000 line of credit was fully drawn. Beginning in the first week in March, the Hales met with the bankers several times a week hoping to arrange for additional financing. The company had not made the March 1 interest payment on the existing loan. J.R. and Bruce Hale stated that no one ever contacted them concerning the delinquent payment and the matter never came up during the March meetings. J.R. Hale carried a blank check to these meetings for the purpose of making the interest payment but stated that he forgot to do so. He stated that on one occasion he called the bank officer assigned to his account and asked the officer to remind him at the next meeting and he would make the payment, but the officer had not done so. Apparently, it was necessary for the bank to calculate the interest payment in order to know the specific amount to be paid.

At the same time that the company was seeking to secure additional financing, the bankers had become concerned about the existing $400,000 loan. The financial statements that the company periodically supplied the bank indicated that the company had lost approximately $800,000 during the last six to seven months. While the Hales were under the impression that additional financing was in the works (a loan application to this effect had been prepared and had been taken to the loan committee for discussion), the bank seriously was considering calling in the company's existing obligations. This possibility never was communicated to the Hales as the bank wished them to remain cooperative. After a meeting on March 22 the bank requested and received from the Hales a list of customers for the undisclosed purpose of using it to collect directly the company's accounts.

The bank called a meeting on March 24 and presented the Hales with a letter stating that all amounts due on the $400,000 revolving line of credit were due and payable immediately. The grounds for the acceleration were stated to be that "The promissory note is in default due to your failure to pay the March 1, 1983 interest payment when due, and also due to the Bank's review of your financial situation which causes the Bank to believe that its prospect for receiving payment of the note is impaired." J.R. Hale produced a blank check and offered to pay the delinquent interest charges but the bank would not reconsider. The bank was able to collect the balance of the note with interest, $418,801.86, in about two weeks after exercising its right to set off the company's accounts at the bank and after receiving payments from the company's customers on their outstanding accounts.

As mentioned, the court directed a verdict for the bank stating that, although a

jury issue existed regarding the bank's acceleration under the insecurity clause, none existed regarding the bank's right to accelerate payments under the interest default clause. The company claims on appeal, as it did before the trial court, that a jury issue existed on whether the bank had waived the interest default clause, or whether there was an implied modification of the note to require notice and demand prior to exercising the clause, or whether the bank was estopped to assert the clause. The bank answers that there was no evidence to show waiver, modification, or estoppel and, in any case, the entry of a directed verdict can be upheld under the insecurity clause since there was no genuine issue over the fact that the bank acted in good faith in concluding that its prospect for repayment was impaired.

*Waiver, modification, and estoppel distinguished.* The company's arguments regarding waiver, modification, and estoppel are intertwined and rely upon the same root proposition: that the conduct of the bank negated the express default provision in the note. The distinctions to be made in the application of these concepts, especially in that of waiver and estoppel, have not always been clear in our cases and some discussion on the point is warranted.

Professor Corbin states that waiver cannot be defined without reference to the particular circumstances to which it is being related, nor can one determine the legal effect of a "waiver" without knowing the facts the term is being used to describe. 3A A.L. Corbin, *Corbin on Contracts* § 752 (1960). To illustrate the concept of waiver of contractual obligations or conditions, he presents the following example within the context of a land conveyance:

> The vendor's "waiver" * * * is his own voluntary action; and in order to be legally effective, it is not necessary that the purchaser shall have given any consideration for it or shall have changed his position in reliance upon it. If the vendor offers to eliminate the condition in exchange for a requested consideration, and the purchaser gives that consideration, the case can still be described as a "waiver"; but it is also a modification by mutual agreement—by a substituted contract—a modification that is not subject to retraction by the vendor.
>
> If the vendor requests and receives no consideration for his waiver, but, as he had reason to foresee, it causes the purchaser to change his position materially in reliance upon it, this too deprives the vendor of his power of retraction for, at the least, a reasonable time. The vendor is then said to be estopped; his own action can still be described as a "waiver", while the resulting action of the purchaser justifies the added description of estoppel.

*Id.* at § 752 p. 481 (footnote omitted). As Professor Corbin also acknowledges, expressions or conduct that lead a party reasonably to believe that certain conditions or obligations will not be insisted upon may operate as a waiver, and courts will then speak in terms of estoppel as well as waiver. *Id.* at § 754 p. 494–96. In this last situation, where one party has induced material changes of position in the other, a waiver of a contractual obligation or condition actually may not have been intended. There is no requirement that this be the case. While waiver depends upon what one himself intends to do, estoppel depends only upon what one's conduct has caused another party to do. *Id.* at § 752 p. 481, n. 2. Professor Corbin also notes that a party may re-establish a condition or obligation that had been eliminated by waiver in the absence of an exchange of consideration or factors that support estoppel. *Id.* at § 764.

■ Generally, New Mexico cases have defined waiver as the intentional relinquishment or abandonment of a known right. *E.g., Young v. Seven Bar Flying Serv., Inc.,* 101 N.M. 545, 685 P.2d 953 (1984). Our decisions recognize that the intent to waive contractual obligations or conditions may be implied from a party's representations that fall short of an express declaration of waiver, or from his conduct. *See Elephant Butte Resort Marina, Inc. v. Wooldridge,* 102 N.M. 286, 289, 694 P.2d 1351, 1354 (1985); *Cooper v. Albuquerque City. Comm'n,* 85 N.M. 786, 790, 518 P.2d 275, 279 (1974); *see also C &*

*H Constr. & Paving Co. v. Citizens Bank,* 93 N.M. 150, 161, 597 P.2d 1190, 1201 (Ct. App.1979). While not express, these types of "implied in fact" waivers still represent a voluntary act whose effect is intended.

In *Ed Black's Chevrolet Center, Inc. v. Melichar,* 81 N.M. 602, 471 P.2d 172 (1970), we stated that, based upon the honest belief of the other party that a waiver was intended, a waiver might be presumed or implied contrary to the intention of the party waiving certain rights. *Id.* at 604, 471 P.2d at 174. Following that decision a number of our opinions discussed a waiver "implied" from a course of conduct in terms of estoppel. These cases represent what we would term here as waiver by estoppel. *See, e.g., Easterling v. Peterson,* 107 N.M. 123, 753 P.2d 902 (1988); *Green v. General Accident Ins. Co. of Am.,* 106 N.M. 523, 746 P.2d 152 (1987); *Shaeffer v. Kelton,* 95 N.M. 182, 619 P.2d 1226 (1980). To prove waiver by estoppel the party need only show that he was misled to his prejudice by the conduct of the other party into the honest and reasonable belief that such waiver was intended.[1] The estoppel is justified because the estopped party reasonably could expect that his actions would induce the reliance of the other party. However, unlike the case of a voluntary waiver, either express or implied in fact, the waiver of the contractual obligation or condition and the effect of the conduct upon the opposite party may have been unintentional.

The law of waiver as discussed by Professor Corbin and our own cases suggests several possible situations: (1) actual waiver, either express or implied in fact, not supported by consideration, which may be retracted in the absence of detrimental reliance; (2) modification, which is not subject to retraction, based upon mutual agreement to waive certain obligations or conditions and the exchange of consideration; or (3) waiver by estoppel based upon either an actual waiver or certain "expressions or conduct" where the reliance of the opposite party and his change of position justifies the inhibition to assert the obligation or condition. We think these distinctions will clarify what appears to be some confusion of definition and expression in our cases.

*Course of conduct in prior commercial dealings.* The company's waiver argument relies, in the main, on our decision in *Clovis National Bank v. Thomas,* 77 N.M. 554, 425 P.2d 726 (1967). The Court in *Thomas* held that a creditor with a perfected security interest in certain cattle had consented to a sale of the cattle, if not expressly, then "certainly impliedly." *Id.* at 560, 425 P.2d at 730. The Court decided that under the Uniform Commercial Code consent to the sale of the collateral constituted a waiver of the creditor's security interest. *Id.* at 563, 425 P.2d at 735. The Court treated the consent issue as an election on the part of the creditor and found no evidence to support estoppel.

The evidence cited by the *Thomas* Court to support a finding of consent involved an extended course of commercial conduct between the parties. Specifically, the creditor on a number of occasions previously had allowed the debtor to sell cattle without the written authorization called for in his contracts. This had occurred under numerous earlier financing agreements as well as on a number of occasions under the particular financing agreement creating the security interest at issue in the *Thomas* case. The Court also referred to the similar custom and practice of the creditor generally with regard to all debtors.

Based upon its reading of *Thomas,* the company would look to the series of financ-

---

1. Although it was not raised and argued to this Court by the parties we wish to reject certain language in *Albuquerque Nat'l Bank v. Albuquerque Ranch Estates, Inc.,* 99 N.M. 95, 101, 654 P.2d 548, 554 (1982), regarding estoppel and the waiver of contractual provisions for timely payments. A party asserting such a claim need not establish that the conduct or silence relied on to create the estoppel was willfully intended to cause the party to act on a false representation or concealment. It is sufficient if any representation by conduct or silence would induce a reasonable and prudent person to believe it was intended to be acted on, or the estopped party should have known that it was both natural and probable that the other party would act upon the conduct or silence under the circumstances.

ing agreements between it and the bank prior to execution of the $400,000 note, and find, in the bank's willingness to accept late payments without reproach on those *earlier* obligations, a waiver of the clause giving the bank the right to declare a default due to delinquent payments without prior notice in the *current* note. We cannot agree that *Thomas* should be read and applied as broadly as the company suggests.

The facts on which the *Thomas* Court relied to find implied consent related to the performance of the particular contract at issue as well as earlier ones. We think that the multiple instances of acquiescence to the sale of cattle under the *one* financing agreement at issue were sufficient to uphold the judgment without reliance upon the conduct of the parties in performing other agreements. In addition, there was evidence to which the Court referred that the creditor expressly had consented to the sale, indeed that the creditor had "requested" that the sale take place. The decision should not be read to suggest that consent (or waiver) can be implied solely from general custom and usage or the course of conduct between two parties *prior* to the execution of a particular contractual agreement. We think that any suggestion to the contrary in *Thomas* was unnecessary to the Court's decision and should not be followed.

■ In the present case the company was in default on the first and only payment that was due on the obligation. Any previous conduct of the bank in accepting late payments involved other obligations. An actual intent to waive the requirement for timely payment, or to waive the contractual right to declare a default without notice, as provided for in their agreement, must be implied from the parties conduct in the performance of that obligation. *Cf. Continental Nat'l Bank of Fort Worth v. Schiller*, 89 Ill.App.3d 216, 44 Ill.Dec. 471, 411 N.E.2d 593 (1980) (evidence that bank had accepted late payments on earlier debts insufficient to show a waiver, express or implied, of timely payments on present debt). Otherwise the express

terms of the agreement would have no meaning at the time of its execution. While conduct under previous contracts may be relevant to show the intent meant to be expressed by provisions in a current contract, here we must assume that the parties intended the unequivocal import of their agreement. Whether their conduct *after* the execution of the agreement indicates an intention to waive a particular provision is another question.

■ We believe our treatment of this issue comports with relevant provisions of the Uniform Commercial Code. NMSA 1978, Section 55–1–205 of the UCC states in pertinent part:

(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

\* \* \* \* \* \*

(3) A course of dealing between parties and any usage of trade \* \* \* give particular meaning to and supplement or qualify terms of an agreement \* \* \* \*

(4) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but, when such construction is unreasonable, express terms control both course of dealing and usage of trade \* \* \* \*

Thus, when the previous conduct of the parties is in direct conflict with the unequivocal express terms of an agreement, the latter is determinative as to the nature of their agreement. *See* NMSA 1978, § 55–1–205(4); *Celebrity, Inc. v. Kemper*, 96 N.M. 508, 632 P.2d 743 (1981).

■ By contrast, the UCC recognizes that the conduct of the parties in *performing* an agreement may be relevant to show a modification or waiver of a provision inconsistent with their conduct in the performance of that agreement. *See* NMSA 1978, § 55–2–208. While this particular UCC provision appears in Article 2 which involves the sale of goods, we find its

principles are consistent with our own cases regarding performance. *E.g., Cowan v. Chalamidas,* 98 N.M. 14, 644 P.2d 528 (1982) ("When a contract payee accepts late [rental] payments without objection as to their timeliness, he impliedly leads the payor to believe that late payments are acceptable."); *see also Easterling v. Peterson,* 107 N.M. 123, 753 P.2d 902 (1988) (rental payments); *Giannini v. Wilson,* 43 N.M. 460, 95 P.2d 209 (1939) (installment sales contract).

■ *No actual waiver, express or implied in fact.* Here, any inference that the bank actually intended to waive its right under the contract to declare a default without notice must rest on postagreement events. We believe that the postagreement conduct of the bank does not suggest that the bank actually intended to waive its rights under the contract. When a party accepts a late payment on a contract without comment he waives the default that existed. With repetition his actions may suggest an intention to accept late payments generally. In this case, the overdue interest payment was the first payment due under the contract; the bank had not accepted any earlier late payments on that contract. The payment was overdue, the company did not request an extension, and after twenty-three days the bank declared a default. The parties agree that the matter of the overdue interest payment was not discussed during the series of meetings when the company sought to obtain additional financing. For good reasons, the fact that the bank would declare a default based upon the unpaid interest payment may have come as a surprise to the Hales, the bank's silence may have been misleading in the light of the earlier commercial behavior of the parties, but we do not believe that the bank's conduct during the month of March gives rise to a factual question that it was the bank's actual intention to relinquish any contractual rights. At most, the bank's conduct indicated an intention simply to ignore the delinquency for about three weeks.

*No modification.* Likewise, we agree with the trial court that the facts of this case do not raise an issue of contract modification. We have concluded in our discussion of the waiver issue that no factual question exists on whether the bank for its part actually intended to waive its right to declare a default based upon the past due interest payment. It follows that there can be no issue of whether the parties intended to substitute a new agreement for their earlier one, or whether the parties mutually agreed to amend the contractual provision concerning default and acceleration, and whether this agreement was supported by consideration. An issue of contract modification should be approached in these terms. *See Michelson v. House,* 54 N.M. 197, 218 P.2d 861 (1950); *Cole v. Casabonne,* 39 N.M. 171, 42 P.2d 1115 (1935); *Raynolds v. Staab,* 4 N.M. 603, 17 P. 136 (1888).

■ *"Waiver by estoppel" presented an issue of fact.* The company's estoppel argument rests upon an important distinction from actual waiver. Here the previous course of dealings between the parties is relevant to show the meaning that the company reasonably might attribute to the bank's conduct in not mentioning the overdue interest payment. Implicit in Section 55–1–205(1) of the UCC is the recognition that, as a practical matter, one party to a contract will use his past commercial dealings with another party as a basis for the interpretation of the other party's conduct. Thus it is to be expected that the company would interpret the bank's behavior during the month of March in light of their earlier dealings and we believe the bank should have been aware of this consideration.

As we have discussed, to prove waiver by estoppel the company only need show that by the conduct of the bank it was misled to its prejudice into an honest and reasonable belief that the bank would not assert its right under the contract to declare a default without first notifying the company and providing an opportunity to make the payment. The conduct of the bank during the month of March, reasonably interpreted in light of their earlier commercial dealings, is sufficient to create a jury question on this issue. *See Melnick*

*v. State Farm Mut. Auto. Ins. Co.,* 106 N.M. 726, 749 P.2d 1105 (1988) (in reviewing directed verdict judgment, court must consider all evidence and reasonable inferences deducible therefrom, resolving any conflicts or contradictions in favor of party resisting motion).

The company introduced evidence to show that the parties had extensive contact during the month of March in order to discuss the company's financial status. Despite ample opportunity, the bank did nothing to alert the company that it was concerned about the past due payment or that the nature of their financial relationship might take a new course. In the words of one bank officer, the bank wished the company to remain "cooperative." J.R. Hale mentioned the interest payment to a bank officer and it is not recorded that the officer in return indicated that the bank attached any importance whatsoever to the matter. His failure to calculate the exact amount due and then remind Hale of the payment at the next conference would communicate just the opposite impression. Additionally, on March 18 the bank gave a written financial reference to Bruce Hale who apparently intended to use the credit reference in seeking financial assistance from other institutions. The reference stated: "All experience with J.R. Hale Contracting Company has been satisfactory." We believe it would not be unreasonable for the Hales to interpret this conduct as an indication that the bank was unconcerned about the past due payment and intended to conduct its business with the company in the same fashion as it had previously. That is, the bank would approach the Hales about any overdue payment and ask how they would care to arrange for payment.

▮ Some of the facts to which we refer can be regarded as silence on the bank's part in the face of an apparent false sense of security of the company. Silence may form the basis for estoppel if a party stands mute when he has a duty to speak. *See McCallister v. Lusk,* 102 N.M. 209, 693 P.2d 575 (1984); *see also Yates v. American Republics Corp.,* 163 F.2d 178 (10th Cir.1947). As we have discussed, the circumstances here suggest that the bank reasonably could expect that the company would rely on the bank's failure to request the interest payment. If so, we believe the bank would have had a duty to inform the company that the bank would enforce performance under the contract according to the letter of their agreement.

On the question of detrimental reliance we note that the company cannot be said to have been lulled by the postagreement conduct into missing the payment when it was first due on March 1. However, we believe the company reasonably might have been induced into not taking the initiative to correct the delinquency and waiting instead for the bank to request the payment or in some fashion draw the matter to the company's attention. Certainly to have the bank declare a default without warning and then accelerate all payments can be considered the detrimental result of the reliance on the impression that the bank's conduct reasonably might have conveyed.

*"Lack of good faith" presented an issue of fact under clause providing for acceleration because of insecurity.* At trial the bank moved for a directed verdict on a second ground, that the company failed to introduce sufficient evidence showing the bank lacked a good faith belief that its prospect for repayment was impaired. The company had the burden of proof on that issue. NMSA 1978, § 55–1–208. The trial judge denied the bank's motion, stating that he believed there were facts in the record from which a jury could conclude that the bank lacked good faith. The bank asserts that the judge applied the wrong standard regarding "good faith" as used in an insecurity clause giving a secured party the power to accelerate payments.

Section 55–1–208 governs the acceleration of notes. It provides that a party may accelerate payment or performance "only if he in good faith believes that the prospect of payment or performance is impaired." *Id.* "Good faith" is defined by Section 55–1–201(19) as "honesty in fact in the conduct or transaction concerned."

There are two schools of thought and corresponding lines of cases addressing the standard of good faith under Section 1–208 of the UCC. The first requires only that a creditor genuinely believe the prospect for repayment is impaired; he need not be reasonable in that belief. This standard is purely subjective and has been described as "the pure heart and the empty head" standard. *Van Horn v. Van De Wol, Inc.*, 6 Wash.App. 959, 960, 497 P.2d 252, 253 (1972). The second standard includes an objective element of whether the creditor was reasonable under the circumstances in believing that the prospect for repayment was impaired.

The subjective standard is probably the majority view today, *e.g.*, *Quest v. Barnett Bank of Pensacola*, 397 So.2d 1020 (Fla. Dist.Ct.App.1981); *Farmers Coop. Elevator, Inc., Duncombe v. State Bank*, 236 N.W.2d 674 (Iowa 1975); *Karner v. Willis*, 238 Kan. 246, 710 P.2d 21 (1985); *Fort Knox Nat'l Bank v. Gustafson*, 385 S.W.2d 196 (Ky.Ct.App.1964); *State Bank of Lehi v. Woolsey*, 565 P.2d 413 (Utah 1977); *Sturman v. First Nat'l Bank*, 729 P.2d 667 (Wyo.1986), but the standard has been criticized strongly as allowing the creditor excessive latitude that imposes a heavy burden of proof on the debtor. *See Black v. Peoples Bank & Trust Co.*, 437 So.2d 26 (Miss.1983); *Universal C.I.T. Credit Corp. v. Shepler*, 164 Ind.App. 516, 329 N.E.2d 620 (1975) (Garrard, J., concurring). In his concurrence in *Universal C.I.T.*, Judge Garrard stated:

[A] purely subjective test is subject to arbitrary abuse. It would allow a creditor to be unreasonable and place the debtor in an unjust position since the creditor might at any time call the entire debt and require the debtor to prove the non-existent state of mind of the creditor. Thus, under this interpretation, the code would permit a creditor to destroy a viable contractual relationship without requiring him to justify his actions.

164 Ind.App. at 524–25, 329 N.E.2d at 626 (footnotes omitted). The subjective standard also has been criticized because:

[a] declaration of insecurity is a unilateral decision made by the creditor which places a severe hardship upon the debtor. This hardship is unjust if the creditor's decision is unreasonable or based upon mistaken facts which the creditor may honestly believe to be true.

*Richards Engrs., Inc. v. Spanel*, 745 P.2d 1031, 1033 (Colo.Ct.App.1987); *see also Watseka First Nat'l Bank v. Ruda*, 175 Ill.App.3d 753, 125 Ill.Dec. 849, 531 N.E.2d 28 (1988); Annotation, *What Constitutes "Good Faith" Under Uniform Commercial Code § 1–208 Dealing With "Insecure" or "At-will" Acceleration Clauses*, 61 A.L.R.3d 244 (1975); Farnsworth, *Good Faith Performance and Commercial Reasonableness Under the Uniform Commercial Code*, 30 U.Chi.L. Rev. 666 (1963) (discussing origins of subjective and objective standards and their applicability to "good faith purchasers" and "good faith performance" under Code).

The original definition for "good faith" in the Proposed Final Draft of the Uniform Commercial Code, published in 1950, differed significantly from the present one. In addition to "honesty in fact," the general definition of good faith in Article 1 was to include "observance of reasonable commercial standards of any business or trade in which [a party] is engaged." *See* The American Law Institute, *Uniform Commercial Code* § 1–201(18) (Proposed Final Draft, 1950). The requirement of reasonable commercial standards was dropped in the Proposed Final Draft No. 2, published in 1951. *See* The American Law Institute, *Uniform Commercial Code* § 1–201(19) (Proposed Final Draft, 1951). A provision for commercial reasonableness thereafter has been included only in other scattered sections of the Code, notably the definition of good faith applicable to merchants. *See* § 55–2–103(1)(b); *see also* §§ 55–2–311(1), 55–3–406, 55–3–419(3), 55–9–318(2). This history suggests an intention to adopt an objective standard of good faith based upon commercial reasonableness only in particular types of transactions and commercial situations.

The only New Mexico case addressing the standard of good faith under an insecurity clause is *McKay v. Farmers &*

*Stockmens Bank of Clayton*, 92 N.M. 181, 585 P.2d 325 (Ct.App.), *writ quashed*, 92 N.M. 79, 582 P.2d 1292 (1978). By a vote of two to one the panel reversed the summary judgment entered on behalf of a bank on the issue of whether the bank in good faith deemed itself insecure in the acceleration of a note. Judge Sutin's special concurrence expressed his view that Section 55–1–208 has both subjective and objective elements. *See id.* at 184, 585 P.2d at 328. The opinion of the court stated little more on the issue of the meaning of "good faith" under Section 55–1–208 than to conclude that the question is usually one of fact rather than a question of law that is amenable to summary judgment. *See id.* at 182–83, 585 P.2d at 326–27.

After an examination of the decisions to which we have referred, and the various provisions in the UCC concerning good faith, we find that the Code does not impose an objective standard of commercial reasonableness on the decision of the bank to accelerate when the bank was honest in its belief that its prospect for repayment was impaired. The requirement of good faith under Section 55–1–208 is quite specifically a standard of honesty in fact. This standard is, however, a minimum one that the parties are free to supplement by agreement. *See* § 55–1–102(3). The company in this case certainly possessed a level of sophistication to have bargained for an agreement more specifically addressing the circumstances under which an acceleration of payments would be allowed. The company does not suggest that the agreement was a contract of adhesion between parties of unequal bargaining position.

In essence, the requirement of honesty in fact is subjective and is concerned with the actual state of mind of the creditor. Nevertheless, the determination of ultimate fact, whether or not the bank lacked a good faith belief in the impairment of its prospect for repayment, should be based on the facts and circumstances surrounding the acceleration and not solely on the bank's testimony concerning its state of mind. Even under a subjective test of good faith the trier of fact may evaluate the credibility of a creditor's claim and in doing so may take into account the reasonableness of that claim. Thus, the conduct and credibility of the creditor may be tested by objective standards subject to proof and conducive to the application of reasonable expectations in commercial affairs.

We do not mean to suggest that *dual* elements of reasonableness and good faith are required. Put simply, in the absence of an objective basis upon which a reasonable person would have accelerated the note, the fact finder could infer that the creditor really did not perceive his prospect for repayment to be impaired. This inquiry necessarily will focus on the facts and circumstances that were known to the creditor. As Judge Sutin noted in *McKay*, expert testimony may be necessary to assist the trier of fact. 92 N.M. at 185, 585 P.2d at 329.

Additionally, honesty is inconsistent with willful ignorance of the facts and circumstances available to the creditor, and thus the facts and circumstances that reasonable investigation would have disclosed may be relevant. While "honesty" may require no more than a pure heart, it is questionable that a pure heart can co-exist with closed eyes. It is not honest to close one's eyes so as to maintain an empty head.

We hold that a fact finder can find that a creditor acted without a good faith belief that its prospect for repayment was impaired when (1), under the facts and circumstances that were known to the creditor, there existed a reasonable inference that the creditor in fact did not conclude that its prospect for repayment was impaired and that acceleration was necessary to protect its interests, or (2) there existed a reasonable inference that the creditor chose not to undertake such investigation as (a) was necessary to make an informed decision and (b) would have shown that the foreseeable risk of nonpayment was not materially greater than when the loan was made.

We agree with the trial court that the company introduced sufficient evidence to establish a prima facie case on the lack

of good faith on the part of the bank. Notwithstanding the company's profitability problems and declining working capital position, a banking expert testified that the bank's collateral position was more than adequate. Additionally, between March 1 and 23 the company had on deposit with the bank more than enough funds to cover the interest payment. This evidence is sufficient to require that the issue be resolved by the fact finder under the standard of good faith necessary to justify acceleration of payments under an insecurity clause.

*Conclusion.* For the reasons stated above, we reverse the district court's grant of a directed verdict in favor of the bank based on the interest default clause and hold that an issue of waiver by estoppel exists to be resolved by the jury. In addition, the company also must prove that the bank lacked a good faith belief that its prospect for repayment was impaired.

IT IS SO ORDERED.

SOSA, C.J., and STEVE HERRERA, District Judge, sitting by designation, concur.