Certiorari Denied, November 16, 2010, No. 32,640

IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2011-NMCA-017

Filing Date:    September 9, 2010

Docket No. 30,549

FRED A. DANTONIO,

    Plaintiff-Appellant,

v.

CHARLES L. CROWDER, PHILIP M. CROWDER,
CHARLES LORNE CROWDER, ORLANDO
CERVANTES, and BERNARD R. GIVEN,

    Defendants-Appellees.

APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY
Robert E. Robles, District Judge

Jane B. Yohalem
Santa Fe, NM

for Appellant

Cervantes Law Firm, P.C.
K. Joseph Cervantes
Las Cruces, NM

L. Helen Bennett, P.C.
L. Helen Bennett
Albuquerque, NM

for Appellees

OPINION

CASTILLO, Judge.

1

**{1}** The opinion filed on July 8, 2010 is withdrawn, and the following opinion is substituted in its place. The motion for rehearing is otherwise denied.

**{2}** In this case we consider the effect of a reversionary clause in a deed which is the subject of a settlement agreement. We hold that the grantee failed to comply with the requirements of the clause and, thus, reversion was warranted. Accordingly, we affirm.

## I.    BACKGROUND

**{3}** Appellant Fred A. Dantonio appeals entry of an order granting title to a 52.8-acre tract (the Fifty-two Acres) in favor of Appellee Orlando Cervantes. The case began in January 1992 when Charles and Phyllis Crowder (the Crowders) conveyed the Fifty-two Acres to the nonprofit organization Southwest Regional High School, Inc. (SWRHS). The deed contained a reversionary condition that limited the use of the property to educational facilities only and required that SWRHS commence construction of the educational facilities prior to January 16, 1994.

**{4}** In 1994, questions arose regarding whether SWRHS complied with the condition and whether SWRHS's alleged non-compliance effected an automatic reversion of the Fifty-two Acres to the Crowders. To resolve these questions, SWRHS filed a quiet title action in district court and the Crowders filed counterclaims.

**{5}** In March 1995, the Crowders and SWRHS executed a written settlement agreement resolving all claims arising from the 1994 quiet title action. The terms of that settlement agreement established a schedule for the construction of the educational facilities that set forth specific dates for the commencement and completion of construction of the ninth, tenth, eleventh, and twelfth-grade classroom buildings as well as the dates by which those classrooms would open with students. The settlement agreement directed that the Fifty-two Acres would automatically revert to the Crowders if SWRHS: (1) failed to operate a high school on the land after August 1996 or (2) failed to obtain accreditation for the high school and maintain that accreditation after the twelfth grade was constructed and twelfth-grade students matriculated. Finally, the settlement agreement provided that once the "requirements" of the construction schedule were satisfied and "accreditation of the high school" was initially secured, the Crowders would execute a waiver of "those requirements."

**{6}** SWRHS completed construction of the ninth-grade classroom building, matriculated students for the ninth grade, and obtained accreditation for the ninth-grade class within the time required under the settlement agreement. The ninth-grade classroom, however, operated for only a single year. SWRHS failed to construct classrooms for the tenth, eleventh, and twelfth grades. SWRHS never received accreditation as a high school and abandoned all but twelve acres of the parcel (the Twelve Acres).

**{7}** As a result of bankruptcy and other proceedings immaterial to this appeal, the Crowders' interest in the Fifty-two Acres was transferred to Cervantes. In July 2002,

2

SWRHS attempted to convey its interest in the Twelve Acres to Dantonio by quitclaim deed. Dantonio is a former member of SWRHS's board of directors and contributed money to SWRHS.

{8}     On January 15, 2003, Dantonio filed suit to quiet title to the Twelve Acres. In response, Cervantes filed an answer, counterclaim, and cross-claim asking that the court quiet title in his favor to the full Fifty-two Acres. Three months later, Cervantes filed a motion for partial summary judgment on the basis that Dantonio had no interest in the property because the Twelve Acres, which is part of the Fifty-two Acres, had already automatically reverted pursuant to the terms of the settlement agreement.

{9}     The district court originally denied Cervantes' motion. In concluding that the reversionary condition had been terminated as to the Twelve Acres, the district court determined the following: the waiver language in the settlement agreement is ambiguous, forfeiture provisions are not favored, the settlement agreement created a divisible condition subsequent, and partial reversion was preferable. The court also concluded that the remainder of the Fifty-two Acres continued to be subject to the reversionary clause and reverted.

{10}    In January 2007, Cervantes filed a timely motion for reconsideration challenging the district court's conclusion that the settlement agreement created a divisible condition subsequent. Cervantes argued that the terms of the settlement agreement required SWRHS to construct and continuously operate a four-year high school and that Dantonio was not entitled to a waiver of the reversionary condition merely because SWRHS constructed a ninth-grade classroom and operated a ninth-grade class for a single year. Finally, Cervantes asserted that the doctrine of partial reversion was inapplicable.

{11}    Reversing its previous ruling, the court granted the motion to reconsider. It concluded that the doctrine of partial reversion was not applicable; that the Fifty-two Acres reverted; and, consequently, that it erred in quieting title to the Twelve Acres in favor of Dantonio. The district court quieted title to the Fifty-two Acres as to any and all adverse claims in favor of Cervantes. Dantonio appeals from this decision.

## II.    DISCUSSION

{12}    Dantonio makes four arguments in support of reversal. He first asserts that the settlement agreement superseded the deed. Alternatively, he contends that a reversion was not triggered. Second, Dantonio argues that the settlement agreement established a divisible contract. Third, Dantonio claims the doctrine of partial reversion is applicable in this matter. Fourth, Dantonio claims that principles of equity prohibit reversion. We address each in turn.

### A.    Standard of Review

3

**{13}** This case comes to us from the district court's order granting Cervantes' motion for partial summary judgment. "Summary judgment is proper if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Roth v. Thompson*, 113 N.M. 331, 334, 825 P.2d 1241, 1244 (1992). "The applicable standard of review of an appeal on summary judgment is de novo, and this Court need not defer to the trial court's analysis of the record and its conclusions of law." *Vill. of Wagon Mound v. Mora Trust*, 2003-NMCA-035, ¶ 57, 133 N.M. 373, 62 P.3d 1255 (filed 2002). To the extent that the issues on review require an expanded discussion of the standard of review, we do so in the context of each issue addressed.

## B.      Deed and Settlement Agreement

**{14}** Dantonio does little to explain the significance of his contention that the settlement agreement "superseded" the deed. The settlement agreement arose out of the Crowders' and SWRHS's dispute as to whether the reversionary condition in the deed had been violated. In our view and under these circumstances, the settlement agreement affected a forbearance of the reversionary condition in the deed. That forbearance was conditioned upon SWRHS's compliance with the terms of the settlement agreement. Accordingly, Dantonio's assertion that the settlement agreement superseded the deed is accurate but only in the sense that the terms of the settlement agreement now take primacy as to the conditions under which automatic reversion is triggered. The settlement agreement did not, however, render the deed a nullity. Title to the property is affected by both documents.

**{15}** In the alternative, Dantonio contends that a reversion was not triggered. To address the party's argument, we examine both the reversionary language in the deed and the pertinent provisions of the settlement agreement.

**{16}** The 1992 deed states as follows:

> [The Crowders] for consideration paid, quitclaim to [SWRHS] . . . the [Fifty-two Acres] . . .
>
> > Provided, however, this property shall be used only for educational facilities. This restriction shall apply to the Grantee, its successors or assigns, and shall run with land. The [Fifty-two acre parcel] shall revert to Grantors if not used for educational facilities. Grantee, its successors or assigns, shall commence construction of these educational facilities prior to January 16, 1994[,] or title to this property shall automatically and without exception revert to the Grantors or their successors or assigns.

There are three pertinent provisions in the settlement agreement. Paragraph two establishes a specific construction schedule:

4

2. SWRHS further agrees that it will at a minimum complete the actual physical construction of the following permanent classroom buildings:

    A. Ninth grade: will commence actual physical construction by October 2, 1995, and will complete construction (issuance of a Certificate of Occupancy) by July 30, 1996[,] and will open ninth grade with students in August 1996.

    B. Tenth grade: will commence actual physical construction by October 2, 1996, and will complete construction (issuance of a Certificate of Occupancy) by July 30, 1997[,] and will open tenth grade with students in August 1997.

    C. Eleventh grade: will commence actual physical construction by October 2, 1997, and will complete construction (issuance of a Certificate of Occupancy) by July 30, 1998[,] and will open eleventh grade with students in August 1998.

    D. Twelfth grade: will commence actual physical construction by October 2, 1998, and will complete construction (issuance of a Certificate of Occupancy) by July 30, 1999[,] and will open twelfth grade with students in August 1999.

Paragraph five of the settlement agreement establishes the conditions under which an automatic reversion is triggered and under what circumstances SWRHS was entitled to a waiver.

SWRHS agrees that should the Land fail to be used for the continuous operation after August 1996 of a co-educational high school . . . or fail to be accredited without delay after the matriculation and start of the first twelfth-grade class, and to remain accredited thereafter, the title to the Land shall automatically revert back to [the Crowders] or to their order. However, upon the satisfaction of the requirements of ¶ 2 . . . of this Agreement by SWRHS and upon obtaining of accreditation of the high school, the Crowders . . . agree to execute a recordable waiver of those requirements, and deliver such to SWRHS for recordation. Conversely, . . . should the Land ever fail to be used as set forth in this paragraph, or, after having become accredited, cease to be accredited, SWRHS shall execute a recordable instrument acknowledging that the Land has reverted to [the Crowders].

Paragraph six is similar in many respects to paragraph five.

SWRHS agrees that if any of the deadlines set forth in paragraphs 1 and 2 . . . are not met, or the terms and conditions described in paragraphs 3 through

5

5 herein are not met, title to the Land shall revert automatically back to [the Crowders]. . . . However, upon the satisfaction of the requirements of [paragraph] 2 . . . of this Agreement by SWRHS and upon the obtaining of accreditation of the high school, the Crowders . . . agree to execute a recordable waiver of those requirements, and deliver such to SWRHS for recordation. Conversely, . . . should the deadlines set forth in paragraphs 1 and 2 . . . and conditions set forth in paragraphs 3 through 5 herein not be met, SWRHS shall execute a recordable instrument acknowledging that the Land has reverted to [the Crowders.]

{17}    As described above, the settlement agreement controls as to the conditions under which an automatic reversion is triggered. Paragraphs five and six of the settlement agreement set out those conditions. The first sentence of paragraph five states that the Fifty-two Acres automatically revert to the Crowders (1) if SWRHS fails to continuously operate a coeducational high school after August 1996 or (2) if SWRHS fails to obtain accreditation of a high school and maintain that accreditation after the twelfth-grade classroom is constructed and twelfth-grade students matriculate.

{18}    The second sentence of paragraph five provides the conditions under which SWRHS was entitled to a waiver of the automatic reversionary condition and the scope of that waiver. SWRHS was entitled to a waiver upon satisfaction of the requirements of paragraph two, i.e., full compliance with the construction schedule of all building for grades ninth through twelfth, *and* upon obtaining accreditation of the high school. Neither of these requirements were satisfied. Accordingly, SWRHS was not entitled to a waiver. As such, we need not address the issue of the scope of that waiver.

{19}    The effect of paragraph five under the present circumstances is clear. SWRHS was required to build and operate a four-year high school. It was also required to obtain and maintain accreditation for that high school. Neither of these requirements was fulfilled. The consequence of nonoccurrence was automatic reversion of the Fifty-two Acres to the Crowders.

C.    **Divisible Contract**

{20}    Dantonio's basic argument is that the revisionary conditions of paragraphs five and six of the settlement agreement are unclear, and the resulting ambiguity must be construed against the grantor to avoid forfeiture. Dantonio also directs us to the deposition testimony of Brian O'Hare, former president of SWRHS who was involved with the negotiations of the settlement agreement. O'Hare stated that at the time he undertook the negotiation and execution of the settlement agreement, it was his understanding that there would be no forfeiture of the ninth-grade building so long as the building was completed within the time frame required under paragraph two irrespective of whether the other three classroom buildings were completed. Dantonio does not argue that the issues regarding ambiguity should be decided by a fact finder. Rather, Dantonio contends that O'Hare's testimony

6

supports the conclusion that the settlement agreement is ambiguous and should be interpreted to create a divisible contract. Thus, according to Dantonio, the settlement agreement established a divisible contract, and the reversionary clause was waived as to the ninth-grade classroom building and the Twelve Acres. Cervantes counters that the settlement agreement is unambiguous and does not establish a divisible contract. We agree with Cervantes.

**{21}** We first look to the terms of the settlement agreement. Whether a contract is entire or divisible depends upon its language and subject matter. *Walters v. United States Fid. & Guar. Co.*, 35 N.M. 4, 7, 288 P. 1044, 1046 (1930). "It is largely a question of construction in each case." *Id.* Dantonio argues that the ambiguity in the contract supports a conclusion that it is divisible. The question of ambiguity is one of law, which we review de novo. *Envtl. Control, Inc. v. City of Santa Fe*, 2002-NMCA-003, ¶ 14, 131 N.M. 450, 38 P.3d 891 (filed 2001).

**{22}** The law governing divisible contracts is well settled. "A severable or divisible contract has been defined as one under which the whole performance is divided into two sets of partial performances, each part of each set being the agreed exchange for a corresponding part of the set of performances to be rendered by the other promisor." *Arrow Gas Co. of Dell City, Tex. v. Lewis*, 71 N.M. 232, 239, 377 P.2d 655, 659 (1963). It is generally held that the determinative factor in deciding whether or not a contract is divisible is the intent of the parties as revealed by the terms of the contract. 15 Richard A. Lord, *Williston on Contracts* § 45:5, at 279 (4th ed. 2000). Accordingly, we must examine whether the language of the settlement agreement demonstrates that the parties intended "to have performance of the contract in parts and have the performance of a part on one side the price or exchange of a corresponding part on the other." *Arrow Gas Co. of Dell City, Tex.*, 71 N.M. at 239, 377 P.2d at 659. "There is a presumption against finding a contract divisible, unless divisibility is expressly stated in the contract itself, or the intent of the parties to treat the contract as divisible is otherwise clearly manifested." 15 Lord, *supra* § 45:4, at 275.

**{23}** Dantonio claims that the settlement agreement pairs the completion of the building requirements of paragraph two with waiver of the reversionary condition. As evidence of this claim, he cites language from paragraph five of the settlement agreement. We discussed paragraph five at length in paragraphs 6-9 of this opinion.

**{24}** Under the terms of paragraph five, reversion is automatically triggered if SWRHS fails to use the Fifty-two Acres for a high school after 1996 or if SWRHS fails to obtain and maintain accreditation of a high school after matriculation of the initial twelfth-grade class. SWRHS was entitled to a waiver upon construction of all four grades together with obtaining accreditation of the high school. Reversion remained automatic if SWRHS thereafter failed to maintain accreditation.

**{25}** We see no ambiguity in the language. There is nothing in paragraph five that indicates the parties intended a divisible contract which would provide for a complete waiver

7

of the reversionary condition upon the completion of the construction and accreditation of each of the four grades.  Indeed, in his brief-in-chief, Dantonio appears to all but concede that the language of the settlement agreement does not support this argument.  There, he acknowledges that the settlement agreement does not explicitly provide for separate waivers of the reversionary conditions for each building.

**{26}** Dantonio next asserts that the assignment of separate deadlines for the construction of each classroom building suggests the parties intended a divisible contract.  This assertion ignores the fact that paragraph five requires SWRHS to complete all four of the classroom buildings and obtain accreditation before an entitlement to a waiver is triggered.

**{27}** Dantonio points to the parties' decision to use the word "land" in the settlement agreement as evidence that the parties intended divisibility.  According to Dantonio, the parties' use of the term "land" indicates that they did not intend for any buildings constructed to revert.  We disagree with this assessment.  The parties' decision to use the broadest term to specify the interest subject to the reversion proves that the land and any improvements on it would automatically revert if the required conditions were not met.

**{28}** We now turn to the evidence provided by O'Hare.  While we agree that *Mark V, Inc. v. Mellekas*, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993), and *C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 508-09, 817 P.2d 238, 242-43 (1991), allow the district court to consider extrinsic evidence when determining whether a contract is ambiguous, in this case, the extrinsic evidence fails to establish ambiguity.  O'Hare testified to his intent about the terms of the settlement agreement.  However, he provided no testimony as to how and to whom he communicated his understanding of the agreement.  Accordingly, his testimony is no more than his  subjective and personal thoughts about the agreement.  "A party's statement of unilateral subjective intent, without more, is insufficient to establish ambiguity in light of clear contractual language." *Envtl. Control, Inc.*, 2002-NMCA-003, ¶ 15.  As we explained above, the language in paragraphs five and six is clear:  it required the construction of buildings for all four grades as well as high school accreditation before any recordable waiver was to be executed.  O'Hare's private interpretation regarding the effect of the completion of construction for the ninth-grade building did not create an ambiguity.  *Id.* ("As a matter of law, one party's subjective impressions, innermost thoughts, or private intentions do not create ambiguity.").

**{29}** Lastly, Dantonio questions reliance on the contract language.  He cites the *Restatement (Second) of Contracts* § 240 (1981) as authority for the assertion that the intent of the parties as represented in the contract is not the key factor in deciding whether a contract is divisible.  This claim is inconsistent with our law.  As discussed above, the governing principle in determining whether a contract is divisible is the manifested intention of the parties. *Arrow Gas Co. of Dell City, Tex.*, 71 N.M. at 239, 377 P.2d at 659.

**{30}** Nevertheless, after reviewing the section of the *Restatement* cited by Dantonio, we

8

see nothing in it which calls into question our conclusion that the settlement agreement is not divisible. The *Restatement* indicates that "[w]hether it is proper to regard the parts of each pair as agreed equivalents will usually depend on considerations of fairness." *Restatement*, *supra*, cmt. e. We see no basis on which to conclude that the settlement agreement is divisible where the unambiguous language of the agreement reflects that it was intended to be treated as entire. *See United Props. Ltd. v. Walgreen Props., Inc.*, 2003-NMCA-140, ¶ 10, 134 N.M. 725, 82 P.3d 535 ("[C]ourts may not rewrite obligations that the parties have freely bargained for themselves . . . [i]n the absence of fraud, unconscionability, or other grossly inequitable conduct." (alteration in original) (internal quotation marks and citation omitted)).

**{31}** Having considered Dantonio's arguments, we hold that the settlement agreement is not divisible.

### D.     Partial Reversion

**{32}** Dantonio argues that the doctrine of partial reversion should have been applied in this case to prevent SWRHS from having to completely forfeit its interest in the Fifty-two Acres. The doctrine of partial reversion, however, is not applicable under the circumstances of this case. There are two cases in New Mexico discussing the doctrine of partial reversion, *Thomas v. City of Santa Fe*, 112 N.M. 456, 816 P.2d 525 (Ct. App. 1991), and *Maloof v. Prieskorn*, 2004-NMCA-126, 136 N.M. 516, 101 P.3d 327. We first adopted the doctrine in *Thomas* where we explained that "[t]he doctrine of partial reversion is based on the court's desire to avoid forfeiture whenever possible and should only be applied when no other means of avoiding a forfeiture are possible." *Thomas*, 112 N.M. at 460, 816 P.2d at 529 (alteration in original) (internal quotation marks and citation omitted); *Maloof*, 2004-NMCA-126, ¶ 8 ("The guiding force behind the doctrine is the principle that reversionary language will be strictly construed so as to avoid forfeiture."). We further explained in *Maloof* that our discussion of partial reversion in *Thomas* supported the conclusion that "where there is a partial failure to comply with a reversionary clause, the judicial desire to avoid forfeiture will either lead to no forfeiture or will limit reversion to the affected property only." *Maloof*, 2004-NMCA-126, ¶ 10. Crucially, however, we concluded in both cases that a partial reversion is only permissible where "the intent underlying the reversionary language" indicates that the parties intended to allow a partial reversion. *Id.* ¶ 8; *Thomas*, 112 N.M. at 461, 816 P.2d at 530.

**{33}** Dantonio conflates the doctrines of divisibility and partial reversion and appears to be arguing that we may deem a contract divisible in order to avoid a complete forfeiture and to effect a partial reversion. As previously discussed, whether a contract is divisible is a question of contract law. *Walters*, 35 N.M. at 7, 288 P. at 1046. We have concluded, under principles of contract, that the settlement agreement in the present matter did not create a divisible contract. Whether the doctrine of partial reversion is applicable in this matter is a wholly separate inquiry. For the two reasons explained below, we disagree the doctrine is applicable here.

9

**{34}** First, Dantonio acknowledges that whether the parties expressed an intent to allow a partial reversion is the controlling inquiry to determine whether the doctrine is applicable. *Maloof*, 2004-NMCA-126, ¶ 8; *Thomas*, 112 N.M. at 461, 816 P.2d at 530. Yet, he has failed to demonstrate that the parties expressed such an intent. Dantonio instead relies primarily on the presumption that "partial reversion is favored" and then argues that this presumption shall prevail absent "a clear statement of intent to prohibit [a partial reversion]." Dantonio misreads the law.

**{35}** Dantonio's contention that partial reversion is applicable here because the parties did not express an intent to prohibit it is the converse of our law. The doctrine of partial reversion is applicable where the parties intended for it to apply. *Maloof*, 2004-NMCA-126, ¶ 8; *Thomas*, 112 N.M. at 461, 816 P.2d at 530. Furthermore, while it is settled law that conditions which work complete forfeitures are disfavored, it is equally settled that "[e]ach party to a contract has a duty to read and familiarize himself with its contents before he signs and delivers it, and if the contract is plain and unequivocal in its terms, each is ordinarily bound thereby." *Smith v. Price's Creameries*, 98 N.M. 541, 545, 650 P.2d 825, 829 (1982). Accordingly, our Supreme Court said in *Berger v. Santa Fe College*, 28 N.M. 545, 549, 215 P. 825, 826 (1923), that while "[i]t may be said that conditions which, if enforced, work a forfeiture of the estate are not favored in the law, and are to be construed strictly and most strongly against the grantor[,] . . . where the language is plain, the condition will ordinarily be enforced." (Citation omitted.) We find nothing which indicates a partial reversion is allowable under the settlement agreement. To the contrary, allowing a partial reversion in this case would frustrate the plain terms of that agreement.

**{36}** Second, both *Thomas* and *Maloof* are distinguishable from the present matter. In both *Thomas* and *Maloof*, a partial reversion was sought by the grantors. *Maloof*, 2004-NMCA-126, ¶¶ 2-7; *Thomas*, 112 N.M. at 458, 816 P.2d at 527. In both cases, the allegation was that the grantees were only partially complying with the reversionary conditions at issue in those cases. *Maloof*, 2004-NMCA-126, ¶¶ 10-12; *Thomas*, 112 N.M. at 458, 816 P.2d at 527. In both cases, portions of the land subject to the reversionary condition were being used in compliance with the condition. *Maloof*, 2004-NMCA-126, ¶ 11; *Thomas*, 112 N.M. at 458, 816 P.2d at 527.

**{37}** The present matter is nothing like these cases. Dantonio, the grantee, is seeking to apply the doctrine of partial reversion. There is no dispute that the reversionary condition has been violated in toto. No portion of the land is being used in compliance with the condition. In fact, the majority of the land subject to the reversionary condition was previously abandoned. Thus, what we said in *Maloof*, 2004-NMCA-126, ¶ 10—the judicial desire to avoid forfeiture will lead to either no forfeiture or partial forfeiture where there is only partial compliance with the reversionary condition—is inapplicable here where partial compliance has not been shown and the grantee completely failed to abide by the condition. These distinctions are significant and serve as a basis to conclude that the doctrine of partial reversion, as it has been developed and applied in *Maloof* and *Thomas*, is inapplicable here .

10

## V.     Equity

**{38}**     Finally, Dantonio argues that principles of equity apply and prevent the forfeiture of the Twelve Acres.  "Equity denotes a spirit of fairness and justness between parties whose rights or claims are in conflict."  *Albuquerque Nat'l Bank v. Albuquerque Ranch Estates, Inc.*, 99 N.M. 95, 654 P.2d 548 (1982), *rejected on other grounds by J.R. Hale Contracting Co., Inc. v. United N.M. Bank*, 110 N.M. 712, 717 n.1, 799 P.2d 581, 586 n.1 (1990). "Although equity abhors forfeitures, the decision whether under the existing facts and equitable factors present before the court a forfeiture or termination should be permitted is a matter for determination by the trial judge."  *Id.*  The district court's determination to grant equitable relief is reviewed only for an abuse of discretion.  *Nearburg v. Yates Petroleum Corp.*, 1997-NMCA-069, ¶ 9, 123 N.M. 526, 943 P.2d 560.

**{39}**     The district court considered Dantonio's equitable arguments and nevertheless quieted title in favor of Cervantes.  We cannot say this was an abuse of discretion.  The terms of the settlement agreement included reversion as an automatic consequence for non-compliance.

## CONCLUSION

**{40}**     For the foregoing reasons, the district court's decision is affirmed.

**{41}**     **IT IS SO ORDERED.**


                                _____

                                **CELIA FOY CASTILLO, Judge**

**WE CONCUR:**

_____

**JONATHAN B. SUTIN, Judge**


_____

**RODERICK T. KENNEDY, Judge**


**Topic Index for *Dantonio v. Crowder*, Docket No. 27,800 and Docket No. 30, 549**

**AE**                    **APPEAL AND ERROR**
AE-SR                Standard of Review

**CN**                    **CONTRACTS**
CN-IN                Interpretation

**CP**           **CIVIL PROCEDURE**
CP-SE       Settlement Agreement
CP-SJ       Summary Judgment

**JM**           **JUDGMENT**
JM-ST       Settlements

**PR**           **PROPERTY**
PR-DD       Deed
PR-PA       Partition
PR-QT       Quiet Title
PR-RE       Real Estate Contract
PR-RR       Reversion

**RE**           **REMEDIES**
RE-EQ       Equity