**Certiorari Granted, May 10, 2013, No. 34,083**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number:  2013-NMCA-059**

**Filing Date:  February 26, 2013**

**Docket No. 31,165**

**AMETHYST LAND CO., INC.,**
**a New Mexico corporation,**

  **Plaintiff-Appellant,**

**v.**

**JAMES F. TERHUNE and**
**ELIZABETH R. TERHUNE,**

  **Defendants-Appellees.**

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Barbara J. Vigil, District Judge**

O'Friel and Levy, P.C.
Aimee S. Bevan
Santa Fe, NM

for Appellant

Clifford C. Gramer, Jr.
Albuquerque, NM

for Appellees

## OPINION

**VANZI, Judge.**

**{1}** Appellant Amethyst Land Co., Inc. (Amethyst) and Appellees James F. Terhune and Elizabeth R. Terhune (the Terhunes) are adjoining property owners in Santa Fe County, New Mexico.  For several years, access to the property now owned by Amethyst was provided by a 40-foot, non-exclusive roadway and utility easement located on the land now owned by the

Terhunes. In 2001, when the Terhunes purchased their property, a predecessor in interest to Amethyst and the Terhunes signed an Extinguishment Agreement to terminate this easement. However, before the Extinguishment Agreement was recorded in the county clerk's office, the predecessor sold its property to Desert Sunrise, LLC (Desert Sunrise), who was unaware of the Extinguishment Agreement and who later sold the property to Amethyst.

**{2}** In 2006, Amethyst filed suit against the Terhunes in district court, claiming that the easement had not been terminated by the Extinguishment Agreement and that a second easement on the Terhunes' land also benefitted its property. The district court entered judgment in favor of the Terhunes, and Amethyst appeals. We reverse the district court's ruling that the easement providing ingress/egress to Amethyst's property has been extinguished, and we affirm the district court's ruling as to the second easement.

**BACKGROUND**

**{3}** Amethyst holds title to a 22-acre parcel of land located in Santa Fe County, New Mexico, which is referred to as "the 22-acre parcel" throughout this Opinion. The Terhunes own a 5-acre parcel adjacent to Amethyst's property, which is referred to as "Tract 3." The subject of the parties' dispute are two easements that run across Tract 3, which Amethyst claims benefit the 22-acre parcel. The first easement is a 40-foot, non-exclusive roadway and utility easement (the 40-foot easement) providing access to Tract 3 as well as across Tract 3 to the 22-acre parcel. Since at least 1979, access to both properties has been provided by a road known as Coyote Mountain Road located on the 40-foot easement from Old Santa Fe Trail. The second easement at issue in this case is an express easement created in 1981 (the 1981 easement). We set forth the relevant history of each of these easements followed by the procedural history of this case.

**{4}** The 1981 easement was created by an express written conveyance that described the 1981 easement as "an access-egress-underground utility easement along and across certain real estate described as Tracts 2 and . . . 3."

**{5}** The 40-foot easement was created by John W. Turner and Marion T. Turner in 1979 in the Turners' warranty deed for sixty acres to Peter Pineda and Lewis Greer. The warranty deed reserved the easement for the benefit of the 22-acre parcel, which was also owned by the Turners at the time. In 1983, the Turners conveyed the 22-acre parcel to MacDuffee, including the 40-foot easement, by warranty deed. Also in 1983, Ocia Peters, Alice Peters, and Caroline Schindler conveyed Tract 3 to Keith MacDuffee via warranty deed. That warranty deed likewise included the existing 40-foot easement providing access to Tract 3, as well as across Tract 3 to the 22-acre parcel. Accordingly, in 1983, MacDuffee owned both Tract 3 and the 22-acre parcel.

**{6}** On or about February 16, 2001, MacDuffee and his wife signed a warranty deed conveying Tract 3 to the Terhunes. The warranty deed was signed on February 16, 2001, notarized on February 29, 2001, and recorded on March 7, 2001. The Terhunes' warranty

deed specifically stated that Tract 3 remained burdened by the 40-foot easement. Thus, at the time it was acquired by the Terhunes, Tract 3 continued to be expressly burdened by the 40-foot easement that provided access to the 22-acre parcel.

{7}     The parties agree that the Terhunes required that the MacDuffees sign an "Extinguishment Agreement" to extinguish access across Tract 3 to the 22-acre parcel as a precondition to their purchase of Tract 3. The Terhunes' attorney prepared the Extinguishment Agreement, which was signed by the MacDuffees on March 5, 2001,[1] and by the Terhunes on April 12, 2001. The MacDuffees delivered the Extinguishment Agreement to the Terhunes prior to the March 7, 2001 closing. However, the Terhunes did not record the Extinguishment Agreement when they recorded the warranty deed and boundary survey for Tract 3 on March 7, 2001.

{8}     On March 20, 2001, the MacDuffees gave a special warranty deed for the 22-acre parcel to Desert Sunrise, LLC (Desert Sunrise), which was recorded by Desert Sunrise on April 25, 2001. Five days later, on April 30, 2001, the Terhunes recorded the Extinguishment Agreement. On the date that the Extinguishment Agreement was recorded, the MacDuffees no longer owned the 22-acre parcel, having already sold that parcel to Desert Sunrise.

{9}     Approximately two years after it acquired the 22-acre parcel, Desert Sunrise sold the parcel to Amethyst by a quitclaim deed that was recorded on April 30, 2003. Following the purchase of the property, Amethyst's attorney performed and completed a records search and subsequently prepared corrected deeds that contained the information he located in the records concerning the easements. Amethyst's attorney then prepared corrected deeds for the transfer of the 22-acre parcel from the MacDuffees to Desert Sunrise, as well as for the subsequent transfer from Desert Sunrise to Amethyst. Thus, the MacDuffees signed a special warranty deed corrected as to Desert Sunrise, which was recorded on September 8, 2003. Desert Sunrise next signed a newly conforming and correcting quitclaim deed to Amethyst, which was recorded on September 22, 2003. One of the documents Amethyst's attorney found in his record review, and subsequently referenced in both of the corrected deeds, was the Extinguishment Agreement.

**Procedural History**

{10}     In 2006, Amethyst filed a declaratory action against the Terhunes in district court, claiming that the 40-foot easement and the 1981 easement both provided access to and

---

[1]We acknowledge that the parties dispute whether the MacDuffees signed the Extinguishment Agreement on March 5, 2000, the date that was acknowledged by a notary on the document, or on March 5, 2001, which coincided with the closing and sale of Tract 3 to the Terhunes. Although it appears that the year "2000" was a mistake based on trial testimony, the date is not central to our holding.

benefitted the 22-acre parcel. Amethyst specifically claimed that the Extinguishment Agreement was of no force and effect. The district court ruled on summary judgment that the 1981 easement does not benefit the 22-acre parcel. A bench trial took place on all remaining issues shortly thereafter, and the district court entered judgment in favor of the Terhunes on the 40-foot easement, determining that the 40-foot easement had been extinguished across Tract 3. Specifically, the district court found that the Extinguishment Agreement was valid and effective; that the Extinguishment Agreement was in the public record at the time Amethyst acquired the 22-acre parcel; that Desert Sunrise and Amethyst, by their corrected deeds, acquiesced to the vacation of the easement across Tract 3; and that Amethyst was equitably estopped by its prior actions from denying the extinguishment of the 40-foot easement on Tract 3. This appeal timely followed.

**DISCUSSION**

**{11}** Amethyst appeals the district court's determination that (1) the 40-foot easement had been extinguished across Tract 3 and (2) that the 1981 easement does not benefit the 22-acre parcel. We address Amethyst's specific arguments with respect to each easement in turn.

**A.     The 40-Foot Easement**

**{12}** Amethyst contends that the district court improperly entered judgment that the 40-foot easement had been extinguished across Tract 3. Because the relevant facts concerning the 40-foot easement are undisputed and our review is of the district court's legal conclusions, we apply de novo review. *See Johnson v. Yates Petroleum Corp.*, 1999-NMCA-066, ¶ 3, 127 N.M. 355, 981 P.2d 288 (stating that when the relevant facts are undisputed, the legal interpretation of those facts is subject to de novo review on appeal); *see also Ponder v. State Farm Mut. Auto. Ins. Co.*, 2000-NMSC-033, ¶ 7, 129 N.M. 698, 12 P.3d 960 ("We review de novo the trial court's application of the law to the facts in arriving at its legal conclusions."). However, to the extent that the district court granted equitable relief in its decision regarding the 40-foot easement, we review under an abuse of discretion standard. *See D'Antonio v. Crowder*, 2011-NMCA-017, ¶ 38, 149 N.M. 426, 249 P.3d 1249.

**{13}** In addressing Amethyst's arguments regarding the 40-foot easement, we undertake two interrelated inquiries. First, we examine whether the district court erred in determining that the Extinguishment Agreement was valid and effective in terminating the 40-foot easement. Second, we address whether the district court's application of equitable principles in this case was erroneous, and more specifically, whether the court improperly determined that Desert Sunrise and Amethyst, by executing corrected deeds that referenced the Extinguishment Agreement, had "acquiesced" to the vacation of the 40-foot easement across Tract 3.

**1.     The Extinguishment Agreement**

**{14}** Before addressing whether the Extinguishment Agreement resulted in the termination

of the 40-foot easement, we provide some pertinent details regarding its terms and execution by the parties. The parties to the Extinguishment Agreement were the MacDuffees, who were identified therein as the owners of the 22-acre parcel, and the Terhunes, who were named as the owners of Tract 3. The Extinguishment Agreement stated that these two parties "desire[d] to extinguish an easement that burdens the Terhune [p]roperty and benefits the MacDuffee [p]roperty." The easement described in the Extinguishment Agreement was the 40-foot easement. It further stated that "for good and valuable consideration, . . . [t]he parties hereby extinguish th[e 40-foot] easement . . . on . . . Tract 3[,]" and that the Extinguishment Agreement "shall run with the land and shall be binding upon and inure to the benefit of the land, and any person or entity vested in title to the tracts of land described herein." Based on the foregoing language, we consider the Extinguishment Agreement in this case to constitute a release, which is typically defined as a formal agreement between parties to terminate an easement, and we thus apply the law governing extinguishment of easements by release to this case. *See* Restatement (Third) of Property: Servitudes § 7.1 cmt. a (2000) (defining "releases" as "formal documents used to terminate servitudes by conveyance from the benefi[t]ted to the burdened parties"); *id.* § 7.3 (describing extinguishment of easements by release); *see also Sedillo Title Guar., Inc. v. Wagner*, 80 N.M. 429, 432, 457 P.2d 361, 364 (1969) (stating that "[a]n easement may be extinguished by an express written release of the servient estate" and that "[i]n order to be effectual, a release must be executed with the same formalities as are generally required in making transfers of interest in land").

**{15}** The Extinguishment Agreement further provided that it was to be "effective upon recordation in the records of Santa Fe County, New Mexico." But even if no such provision had been included, we would nonetheless conclude that the Extinguishment Agreement, as a written instrument affecting the title to real estate, was subject to the general recording provisions of NMSA 1978, Sections 14-9-1 to -3 (1886-87, as amended through 1991). *See* § 14-9-1 (providing that "[a]ll . . . writings affecting the title to real estate shall be recorded in the office of the county clerk of the county or counties in which the real estate affected thereby is situated"). Our Supreme Court recently applied New Mexico's recording provisions to extinguish an unrecorded easement where a good faith purchaser acquired real estate without notice of the easement. *See City of Rio Rancho v. Amrep Sw., Inc.*, 2011-NMSC-037, ¶¶ 42-43, 150 N.M. 428, 260 P.3d 414 (reasoning that the "benefits produced by subjecting easements to extinguishment under the recording act will outweigh the social costs because prospective purchasers will be able to rely on the property records" (alteration, internal quotation marks, and citation omitted)). Although the case before us involves a real estate transaction at the other end of the spectrum—that is, an agreement attempting to terminate, rather than create, an easement—we see no reason to exclude written releases from New Mexico's recording provisions. We thus agree with the Restatement (Third) of Property that releases "should be recorded to protect the servient owner against the possibility that a subsequent bona fide purchaser of the dominant estate will take free of the release." Restatement (Third) of Property: Servitudes § 7.3 cmt. a; *see id.* § 7.15 cmt. a (stating that in order "[t]o protect themselves against revival of a servitude that has been modified or terminated, the parties should record the release or modification agreement").

5

**{16}** Turning now to the relevant facts concerning the execution and recording of the Extinguishment Agreement, we observe that the Extinguishment Agreement was signed by the MacDuffees on March 5, 2001, and nearly six weeks later by the Terhunes on April 12, 2001. During this gap in execution, the MacDuffees sold the 22-acre parcel to Desert Sunrise, Amethyst's predecessor, and Desert Sunrise recorded its special warranty deed for the purchase of the 22-acre parcel on April 25, 2001. Five days later, the Terhunes recorded the Extinguishment Agreement. Thus, on the date that the Extinguishment Agreement was recorded, the MacDuffees were no longer the owners of the 22-acre parcel. We must therefore determine whether the Extinguishment Agreement was effective in terminating the 40-foot easement even though it was recorded after Desert Sunrise purchased the 22-acre parcel and recorded its deed.

**{17}** The district court ruled that since the Extinguishment Agreement was in the public record when Amethyst acquired the 22-acre parcel from Desert Sunrise, Amethyst took title to the 22-acre parcel "with notice of, and subject to, the Extinguishment Agreement." On appeal, Amethyst contends that the district court erred in its application of New Mexico's recording provisions, Sections 14-9-1 to -3, to the facts of this case. Amethyst specifically argues that its predecessor in interest, Desert Sunrise, was a bona fide purchaser who acquired the 22-acre parcel without notice of the Extinguishment Agreement and, consequently, the Extinguishment Agreement was ineffective in terminating the 40-foot easement, such that Desert Sunrise essentially acquired the 22-acre parcel with the 40-foot easement still in place. Having acquired the 22-acre parcel from Desert Sunrise, Amethyst contends that it, too, acquired the 22-acre parcel with the benefit of the 40-foot easement. In addition, Amethyst argues that the Extinguishment Agreement was ineffective in terminating the 40-foot easement because the MacDuffees no longer owned the 22-acre parcel on the date that the Extinguishment Agreement was recorded.

**{18}** We agree with Amethyst that the district court erred in its application of New Mexico's recording provisions to the facts of this case. "Section 14-9-3 provides that unrecorded instruments asserting interests in real estate shall not affect the title or rights of purchasers to real estate if the purchaser did not have knowledge of the existence of such unrecorded instruments." *Amrep Sw.*, 2011-NMSC-037, ¶ 40. In this case, Desert Sunrise did not have notice of the Extinguishment Agreement. The original special warranty deed[2] from the MacDuffees to Desert Sunrise did not mention the 40-foot easement or the Extinguishment Agreement. And although the deed corresponding to MacDuffee's sale of Tract 3 to the Terhunes was already recorded at the time Desert Sunrise acquired title to the 22-acre parcel, that deed stated only that Tract 3 was still burdened by the 40-foot easement and did not mention the Extinguishment Agreement. Thus, even if Desert Sunrise had come

---

[2]Although this warranty deed was later "corrected" by Amethyst's attorney, our discussion here concerns the original special warranty deed that was recorded by Desert Sunrise. We address the impact of the corrected deeds filed by Amethyst's attorney on our ultimate holding later on in this Opinion. *See* Op. ¶¶ 24-27.

across the Terhunes' deed for Tract 3 during the course of its record search, the deed would not have alerted Desert Sunrise to the existence of the Extinguishment Agreement. In addition to the lack of record notice, the parties do not dispute that Desert Sunrise did not have actual or inquiry notice of the Extinguishment Agreement at the time that it acquired the 22-acre parcel.

{19} Accordingly, because Desert Sunrise was a bona fide purchaser without notice of the Extinguishment Agreement, it acquired title to the 22-acre parcel free of the Extinguishment Agreement, and the 22-acre parcel continued to be benefitted by the 40-foot easement. *See* Restatement (Third) of Property: Servitudes § 7.15 (providing that "[a]n unrecorded modification or termination of a recorded servitude is not effective against a subsequent taker of an interest in property burdened or benefi[t]ted by the servitude who is otherwise entitled to the protection of the recording act"). Stated differently, the release in this case—the Extinguishment Agreement—was extinguished under Section 14-9-3 by Desert Sunrise's good faith purchaser status. *See* § 14-9-3 (providing that an unrecorded instrument shall not affect the rights or title to property of a purchaser without knowledge of the unrecorded instrument). We find the following example from the Restatement particularly instructive:

> Dawn purchased Lot 2 relying on the record title which showed that Lot 2 was benefi[t]ted by a covenant requiring that any structure built on Lot 1 be located so as not to interfere with the view of the ocean from Lot 2. Prior to Dawn's purchase of Lot 2, the owners of Lots 1 and 2 had entered into a written agreement by which the owner of Lot 2 released the covenant. The release was not recorded until after the conveyance of Lot 2 to Dawn, who had no notice. In the absence of other facts or circumstances, *Dawn takes free of the release; Lot 2 continues to be entitled to the benefit of the covenant*.

Restatement (Third) of Property: Servitudes, § 7.15 cmt. a, illus. 4 (emphasis added). Although the Terhunes later recorded the Extinguishment Agreement, this recording did not revive the Extinguishment Agreement, and it thus remained ineffective against Desert Sunrise. Tract 3 remained burdened by the 40-foot easement during the time period that Desert Sunrise owned the 22-acre parcel.

{20} The Terhunes resolutely ignore Desert Sunrise's bona fide purchaser status in their answer brief and instead focus on the fact that the Extinguishment Agreement was recorded prior to Amethyst's purchase of the 22-acre parcel from Desert Sunrise. Relying on *Angle v. Slayton*, 102 N.M. 521, 697 P.2d 940 (1985), the Terhunes argue that "even though the Extinguishment Agreement was recorded out-of-sequence with [Desert Sunrise's] record title to the 22-acre[ parcel]," Amethyst took title subsequent to the recording and therefore had constructive notice of and was subject to the Extinguishment Agreement. We are not persuaded by this argument because the facts of this case bear little resemblance to those found in *Angle*. *Angle* involved an individual who recorded her partial interest in an oil and gas lease several years after having received it and after her grantor had divested itself of all

title to the lease. *Id.* at 522, 697 P.2d at 941. However, because she recorded her interest prior to a third party's acquisition of the lease by quitclaim deed, our Supreme Court concluded that the third party had constructive notice of the recorded interest and could not seek the protection of the recording laws. *Id.* at 523-24, 697 P.2d at 942-43. The Court essentially applied the general rule that in order to "prevail over a subsequent purchaser under [New Mexico's notice recording] statute, an owner of an interest in real property must record before the acquisition of a conflicting interest in the same property by the subsequent purchaser." *Id.* at 523, 697 P.2d at 942.

**{21}** Whereas *Angle* involved a timely recorded instrument, the Terhunes failed to record the Extinguishment Agreement until after Desert Sunrise recorded its deed for the 22-acre parcel. *Angle* is therefore distinguishable and does not support the Terhunes' argument that the Extinguishment Agreement, once recorded, continued to be effective even though Desert Sunrise acquired the 22-acre parcel prior to the recording and without any notice of the Extinguishment Agreement. To permit such a result would circumvent the purpose of our state recording provisions, which is "to protect [good faith] purchasers against loss" and protect their property rights. *See Amrep Sw.*, 2011-NMSC-037, ¶ 39 (alteration in original) (internal quotation marks and citation omitted). We conclude that Amethyst acquired the property interests and rights that Desert Sunrise had at that time in the 22-acre parcel, which included the benefit of the 40-foot easement. That is, the Extinguishment Agreement was ineffective against Amethyst, even though Amethyst's attorney came across the recorded Extinguishment Agreement during the title search prior to purchasing the 22-acre parcel. *See* 14 Richard R. Powell, *Powell on Real Property* § 82.03[2][b], at 82-76 & n.24 (Michael Allan Wolf ed., Matthew Bender 2008) (stating in the context of a hypothetical example, that where a bona fide purchaser later resells his property to a third party, "the bona fide purchaser status would descend to [the third party], even if [the third party] knows of [the unrecorded or late-recorded conflicting] interest. This is necessary, not to protect [the third party], but rather to protect [the bona fide purchaser]. Without this protection, [the bona fide purchaser] might be secure in his own possession, but he would be unable to convey it to anyone else. Such a result would not adequately protect [the bona fide purchaser's] property rights in the real estate."); *see also Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 524 (Minn. 1990) (stating that a bona fide purchaser "may pass title free of [an] unrecorded interest to a subsequent purchaser who otherwise would not qualify as a bona fide purchaser under the recording act" because otherwise, a "bona fide purchaser would be deprived of the full benefit of the purchase—the right to transfer good title to a subsequent purchaser"); *Hicks v. Loveless*, 714 S.W.2d 30, 32 (Tex. Ct. App. 1986) (stating that if a purchaser acquired a lot without notice of deed restrictions, "the restrictions would not burden his title" and the purchaser could transfer the lot free of the restrictions to a third party, even if the third party "had notice of the restrictions").

**{22}** Furthermore, Amethyst correctly points out that on the date the Extinguishment Agreement was recorded, the MacDuffees no longer owned the 22-acre parcel and had no authority to extinguish easements benefitting that property. We agree. In *Pollock v. Ramirez*, 117 N.M. 187, 188, 870 P.2d 149, 150 (Ct. App. 1994), the owners of a subdivision

8

attempted to impose restrictive covenants on the subdivision. We held that two attempts by the owners to file and record the restrictive covenants were unsuccessful because the first filing did not comply with the acknowledgment requirements of our recording act, *id.* at 189-90, 870 P.2d at 151-52, and the second filing and recording occurred after the owners no longer owned the property, having already conveyed it to a third party prior to recording. *Id.* at 190, 870 P.2d at 152. Of specific relevance here, we held that the second attempt was invalid in imposing restrictive covenants on the subdivision because the grantors could not place restrictions on land they did not own. *Id.* As in *Pollock*, the Extinguishment Agreement that was recorded by the Terhunes was invalid in terminating the 40-foot easement because the MacDuffees no longer owned the 22-acre parcel on the recording date and consequently had no legal authority to release an easement on property that they no longer owned.

**{23}** Based on the foregoing, we conclude that the district court erred in determining that the Extinguishment Agreement was valid and effective. However, the district court went on to conclude that by filing corrected deeds that referred to the Extinguishment Agreement, Amethyst was equitably estopped from denying the extinguishment of the 40-foot easement. We therefore consider whether the district court erred in determining that Desert Sunrise and Amethyst, by filing corrected deeds, acquiesced to the extinguishment of the 40-foot easement.

## 2.  The District Court's Grant of Equitable Relief Based on the Corrected Deeds

**{24}** The parties' dispute in this case was unnecessarily complicated by the actions of Amethyst's attorney following Amethyst's purchase of the 22-acre parcel. By drafting and recording "corrected" deeds for the MacDuffee-Desert Sunrise and Desert Sunrise-Amethyst transfers of the 22-acre parcel, Amethyst's attorney muddied what, otherwise, would have been a relatively straightforward application of the recording provisions to the Extinguishment Agreement by the district court. Both corrected deeds that were signed by all parties to the deeds and recorded by Amethyst described the 22-acre parcel as including:

> Together with a non-exclusive easement . . . (40) feet in width for utilities
> and right of way . . . said easement . . . *partially vacated in Book 1895, Pages*
> *602-604*, all in the records of the Clerk of Santa Fe County, New Mexico.

(Emphasis added.) The italicized language above was the recorded Extinguishment Agreement, which we have determined above was invalid and ineffective in terminating the 40-foot easement. The district court, however, determined that the reference to the Extinguishment Agreement in the corrected deeds rendered it effective against Amethyst. The court granted equitable relief to the Terhunes, finding that Amethyst had "acquiesced to the vacation of the easement" and was "equitably estopped" from denying the extinguishment of the 40-foot easement.

**{25}** While we do not take lightly the actions of Amethyst's attorney, we ultimately

conclude that the corrected deeds did not revive the Extinguishment Agreement or otherwise terminate the 40-foot easement.  We are not persuaded that the reference in the corrected deeds to the Extinguishment Agreement was adequate to establish an intent of the parties to the corrected deeds to revive the Extinguishment Agreement and terminate the 40-foot easement.  *See, e.g.*, *Breliant v. Preferred Equities Corp.*, 918 P.2d 314, 319 (Nev. 1996) ("[T]he mere reference to an extinguished easement in a deed is insufficient, as a matter of law, to revive the easement."); *Capital Candy Co. v. Savard*, 369 A.2d 1363, 1365 (Vt. 1976) (holding that a reference in a deed to an earlier right-of-way that was extinguished by law did not constitute a re-creation of the right-of-way).  The use of the term "partially vacated" in the corrected deeds further confirms that the parties to the corrected deeds did not believe that the 40-foot easement was completely extinguished.

**{26}**    Moreover, the district court's application of equitable estoppel in this case was erroneous and, therefore, constituted an abuse of discretion.  *See State v. Elinski*, 1997-NMCA-117, ¶ 8, 124 N.M. 261, 948 P.2d 1209 (providing that a misapprehension of the law constitutes an abuse of discretion), *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, 275 P.3d 110.  "Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy."  *Gonzales v. Gonzales*, 116 N.M. 838, 846, 867 P.2d 1220, 1228 (Ct. App. 1993) (internal quotation marks and citation omitted).  "[T]he following elements must be shown as to the party claiming estoppel:  (1) [l]ack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially."  *Mem'l Med. Ctr., Inc. v. Tatsch Constr., Inc.*, 2000-NMSC-030, ¶ 9, 129 N.M. 677, 12 P.3d 431 (internal quotation marks and citation omitted).  In this case, the district court entered no findings or conclusions on any of these elements.  Our review of the record also does not show any indication that the Terhunes were deceived or misled by Amethyst's conduct or that they relied upon the language of the corrected deeds into believing that the 40-foot easement had been extinguished.  Accordingly, there was no factual basis upon which the district court could apply equitable estoppel.

**{27}**    We note that the Terhunes appear to concede that the district court's application of equitable estoppel was erroneous, and they argue instead that the court "considered and applied estoppel by deed in this case."  The district court nowhere in its findings and conclusions stated that it was applying estoppel by deed.  Based on the foregoing, we conclude that the district court erred in determining that the 40-foot easement had been extinguished.  We hold that the 40-foot easement continues to burden Tract 3.

### B.    The 1981 Easement

**{28}**     Amethyst also appeals the district court's ruling on summary judgment that the 1981 easement does not provide access to the 22-acre parcel.  We review de novo an order granting or denying summary judgment.  *See Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 7, 148 N.M. 713, 242 P.3d 280.  As noted earlier, the 1981 easement was created by an express written conveyance to the MacDuffees.  Amethyst contends on appeal that the language of the 1981 easement, as well as a subsequent easement for encroachment granted by MacDuffee in 1987, indicate that the 1981 easement was intended to benefit the 22-acre parcel.  In order to ascertain whether the district court erred in its interpretation of these easements, we examine the language of both of these express easements.

**{29}**     "[A]n easement should be construed according to the intent of the parties."  *Amrep Sw.*, 2011-NMSC-037, ¶ 35 (internal quotation marks and citation omitted).  In discerning that intent, "we place heavy emphasis . . . on the written expressions of the parties' intent." *Id.* ¶ 37 (omission in original) (internal quotation marks and citation omitted).  "[T]he language in a granting instrument should be interpreted to accord with the meaning an ordinary purchaser would ascribe to it in the context of the parcels of land involved." *Id.* (internal quotation marks and citation omitted); *see Sanders v. Lutz*, 109 N.M. 193, 194, 784 P.2d 12, 13 (1989) (providing that an "easement should be construed according to its express and specific terms as a manifestation of the intent of the parties").

**{30}**     Viewing the language of the 1981 easement in light of the foregoing principles, we conclude that the district court correctly determined that this easement was not meant to benefit the 22-acre parcel.  The 1981 easement was described in the written conveyance as "an access-egress-underground utility easement *along and across certain real estate described as Tracts 2 and . . . 3*."  (Emphasis added.)  The 22-acre parcel was not mentioned either in the description of the easement or elsewhere in the written instrument.  More significantly, the written instrument included a limitation on the estates that could be served by the 1981 easement—expressly requiring the MacDuffees, as grantees, to "agree, covenant and contract with [the] grantors" that they "will never allow the easement . . . to be extended so as to serve any other lot, tract[,] or property except . . . Tract 1."  We view this language as an express manifestation of the parties' intent that the easement was not to serve any lots other than Tracts 2 and 3 (on which the easement ran) and Tract 1.  We therefore conclude that the district court did not err in its interpretation of the terms of the 1981 easement.

**{31}**     In addition, the easement for encroachment granted six years later by MacDuffee does not support Amethyst's position that the 1981 easement was intended to provide access to and benefit the 22-acre parcel.  Aspects of the easement for encroachment undercut its validity.  The written instrument creating the easement for encroachment named MacDuffee as both the grantor and grantee of the easement.  And as Amethyst acknowledges in its briefing, the easement was granted at a time when MacDuffee was the owner of both the 22-acre parcel as well as Tract 3.  It is well established that a landowner "cannot have an easement in his own land, as all the uses of an easement are fully comprehended and embraced in his general right of ownership."  *Michelet v. Cole*, 20 N.M. 357, 363, 149 P.

11

310, 311 (1915). As a result, it does not appear that the easement for encroachment is valid and effective, and we therefore do not consider this easement further. *See* Jon W. Bruce & James W. Ely, Jr., *The Law of Easements and Licenses in Land* § 3.11, at 3-34 to -35 (2012) (confirming that a landowner cannot obtain an easement in his/her own property and that, generally, "[i]f a landowner attempts to create an express easement in favor of [himself], the purported interest is a nullity"). We affirm the district court's determination that the 1981 easement does not benefit the 22-acre parcel.

**CONCLUSION**

**{32}** Based on the foregoing, we reverse in part and affirm in part the judgment of the district court. We reverse the district court's ruling as to the 40-foot easement and conclude that the 40-foot easement has not been extinguished and continues to benefit the 22-acre parcel. We affirm the district court's determination that the 1981 easement does not benefit the 22-acre parcel.

**{33}  IT IS SO ORDERED.**

 

 

_____

**LINDA M. VANZI, Judge**

**WE CONCUR:**

_____

**RODERICK T. KENNEDY, Chief Judge**

_____

**J. MILES HANISEE, Judge**

**Topic Index for *Amethyst Land Co., Inc. v. Terhune*, No. 31,165**

**CIVIL PROCEDURE**
Estoppel
Summary Judgment

**JUDGES**
Abuse of Discretion

**PROPERTY**
Bona Fide Purchaser
Easement
Purchaser
Quitclaim
Real Property General

Recording
Right of Way
Unrecorded Deed

**REMEDIES**
Equity